FILED

2008 Feb-15  PM 04:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| WILLIAM H. EASTRIDGE, | ] | |
| | ] | |
| Plaintiff, | ] | |
| | ] | |
| vs. | ] | 7:05-CV-00248-LSC |
| | ] | |
| NORFOLK SOUTHERN RAILWAY | ] | |
| COMPANY, | ] | |
| | ] | |
| Defendant. | ] | |

MEMORANDUM OPINION

I.   Introduction.

The Court has for consideration Defendant Norfolk Southern Railway Company's ("Norfolk Southern") Motion for Summary Judgment (Doc. 52), filed on November 5, 2007; Defendant Norfolk Southern's Motion to Preclude Testimony on Grounds of Lack of Reliability and Relevancy under *Daubert* and Federal Rule of Evidence 702 (Doc. 50), filed on November 5, 2007; and Defendant Norfolk Southern's Motion to Transfer (Doc. 63), filed on November 16, 2007.  Plaintiff William H. Eastridge ("Eastridge") filed suit against Norfolk Southern under the Federal Employer's Liability Act, 45

U.S.C. § 51, *et seq.* ("FELA").   The issues raised in Norfolk Southern's motions have been briefed by the parties and are now ripe for consideration.   Upon full consideration of the legal arguments and evidence presented, Norfolk Southern's motion for summary judgment is due to be denied.

II.    Facts.[1]

Plaintiff, William H. Eastridge, was employed by Norfolk Southern from September 5, 1975 to January 3, 2004.   (Doc. 62.)   Initially, Eastridge was hired as a brakeman or trainman.   *Id.*   In 1978, Eastridge became a locomotive engineer, in which position Eastridge served for the majority of his career with Norfolk Southern.   *Id.*   Over the course of his career, Eastridge worked primarily out of the John Sevier Yard ("Sevier Yard") in Knoxville, Tennessee; however, from time to time, he would work jobs in other locations.   *Id.*   During the course of his employment with Norfolk

---

[1]The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record.   All reasonable doubts about the facts have been resolved in favor of the nonmoving party.   *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).   These are the "facts" for summary judgment purposes only.   They may not be the actual facts.   *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

Southern, Plaintiff worked on various types of jobs including road jobs, yard jobs, and local jobs. *Id.* A road job is a job where the "train crew takes a train from one location to another . . . and the return trips from such locations." *Id.* A yard job consists of the train crew working "primarily in a rail yard." *Id.* A local job is a job "which begins in a rail yard, proceeds to an outlying point, picking up and setting out rail cars at industries along the way, and then returns to the rail yard where the job began." *Id.*

While working as a brakeman/trainman, Eastridge performed only road jobs. *Id.* As a locomotive engineer, Eastridge spent about half of his time working on road jobs, and about half his time performing various yard jobs. *Id.* While working yard jobs, Eastridge spent approximately half his time working the "hump" job,[2] and the remainder of his time working in the east end of the Sevier Yard, operating a locomotive to pull cars out of the Classification Yard and move them into the Forwarding Yard. *Id.*

Eastridge did not begin working yard jobs until at least 1980 or 1981. *Id.* From about 1981 to 1990, Plaintiff worked local jobs, yard jobs, and

---

[2]The "hump" job is a job where a locomotive is used to shove cars over the hump and into the Classification Yard. (Doc. 62.) This job begins on the western end of the Sevier Yard, goes to the hump, and then returns to the western end. *Id.*

work trains.  *Id*.  Then, from 1990 to 2000, he performed mostly hump jobs.  *Id*.  From 2000 to 2004, Eastridge did not work in the Sevier Yard, instead, he served as the engineer on road trains.  *Id*.

In railroad operations, sand is used "to provide traction between locomotive wheels and the rails."  *Id*.  At the Sevier Yard, sand is supplied from a covered hopper car from which the sand drops, by gravity, through hoses into a pressurized tank.  *Id*.  From the pressurized tank, the sand is moved by air into sixteen sand towers, one at a time.  *Id*.  The locomotives receive sand from the sand towers through a hose and nozzle.  *Id*.

In operating the locomotives, Plaintiff's contact with the sand varied.  *Id*.  He did not use sand constantly while operating the locomotive.  *Id*.  Also, he never stayed on a locomotive while sand was being added to the locomotive at the diesel shop. *Id*. Plaintiff did, however, mechanically release sand from his locomotive onto the tracks while working as a locomotive engineer to provide traction for the locomotive in starting, stopping, or ascending steep grades.[3]  *Id*.  While Plaintiff claims he was

---

[3]When sand is applied to the rails for traction, it comes out onto the rails in front of the wheels in the direction of movement.  (Doc. 62.)

exposed to dust, which was created during the filling of the sand towers, he never complained about the dust while employed by Norfolk Southern. (Doc. 58.)

In regards to the layout of the Sevier Yard, several aspects are important to note.  The Sevier Yard is about two miles long and a quarter of a mile wide.  (Doc. 62.)   Within the Sevier Yard is a diesel ramp, which is the area where the locomotives are supplied with fuel and sand.  *Id.*  A dust collector is located about 200 feet east of this diesel ramp.  The hump was located over 300 yards west of the diesel ramp.  *Id.*

Plaintiff's location with respect to each of these aspects of the Sevier Yard depended on the job he was performing.  *Id.*  When Plaintiff was working a hump job, he would start approximately one half a mile or more west of the hump.  *Id.* His distance from the dust collector varied depending on what job he was performing.  *Id.*  In addition, Plaintiff's distance from the diesel ramp varied depending on his job, and there were times, especially when he worked in the east end of the Sevier Yard, when he was a long way from the location where the locomotives received fuel and sand. *Id.*

In about 2003, Eastridge began coughing and noticed a shortness of breath.[4] *Id.* A few weeks after noticing these conditions, Plaintiff went to see a doctor. *Id.* Eastridge has been diagnosed with an interstitial lung disease,[5] which he alleges is silicosis caused by exposure to silica during the course of his employment with Norfolk Southern. *Id.* Norfolk Southern alleges that Eastridge's lung disease is idiopathic pulmonary fibrosis, also known as usual interstitial pneumonitis, which is not related to his employment with Norfolk Southern. *Id.* Since his diagnosis with the interstitial lung disease, Plaintiff's breathing problems have gotten worse. *Id.* As a result of this lung disease, Plaintiff contends that he is permanently and totally disabled. *Id.*

Plaintiff contends that his work environment exposed him to dangerous levels of respirable silica, which caused his interstitial lung disease. Plaintiff also alleges that he was exposed to asbestos in the course of his employment. Plaintiff claims that Norfolk Southern negligently failed to

---

[4]From 1966 to 1981, Plaintiff smoked approximately one pack of cigarettes per day. (Eastridge 9/13/2005 Dep. at 53; Eastridge 9/14/2005 Dep. at 91.)

[5]There are numerous types of interstitial lung diseases.  (Doc. 62.)

provide him with a safe place to work, with safety equipment, and failed to

warn him of the hazards.  Thus, Plaintiff filed suit under the FELA.

III.    Motion to Preclude Testimony on Grounds of Lack of Reliability and Relevancy under *Daubert* and FRE 702.[6]

In conjunction with its motion for summary judgment, Defendant has

moved to exclude the testimony of Vernon E. Rose, Ph.D.("Rose"), David F.

Goldsmith, Ph.D. ("Goldsmith"), Tee L. Guidotti, M.D.("Guidotti"),certain

testimony of Elise Schriver, M.D. ("Schriver"), and expert testimony by

Plaintiff and any co-worker witnesses.  (Doc. 50.)

A.    *Daubert* Analysis.

While Federal Rules of Evidence 401 and 402 provide for the liberal

admission of relevant evidence, Rules 403, 702, and 703 mitigate against this

general policy by giving trial courts discretion to exclude expert testimony

that is either unreliable or irrelevant.  *Allison v. McGhan Medical Corp.*, 184

F.3d 1300, 1310 (11th Cir. 1999).  The Eleventh Circuit Court of Appeals

_____

[6]Defendant has requested a hearing on the *Daubert* Motion in the event that the Court finds that its motion is due to be denied.  (Doc. 70 at 8.)  While evidentiary hearings can be helpful, they are not a mandatory condition precedent to determination of whether expert opinions are excludable under *Daubert*.  *See Corwin v. Walt Disney Corp.*, 475 F.3d 1239, 1252 n.10 (11th Cir. 2007).  The Court has determined that a hearing would not be beneficial with respect to the proffered experts.

summarized the applicable rules in *City of Tuscaloosa v. Harcross Chem.,*

*Inc.*, 158 F.3d 548, 562 (11th Cir. 1998), when it wrote that scientific expert

testimony is admissible when (1) the expert is qualified to testify

competently regarding the matters he intends to address; (2) the

methodology by which the expert reaches his conclusion is sufficiently

reliable as determined by the sort of inquiry mandated in *Daubert*; and (3)

the testimony assists the trier of fact, through the application of scientific,

technical, or specialized expertise, to understand the evidence or to

determine a fact in issue.  *See also, e.g., Allison*, 184 F.3d at 1309; *Toole*

*v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1312 (11th Cir. 2000).

In *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993),

the U.S. Supreme Court imposed a special duty on trial judges pursuant to

Rule 702, requiring the judge to act as a "gate-keeper" and ensure that

scientific evidence is both reliable and relevant before it is admitted.  *Id.*

The Supreme Court has recognized that judges are not trained scientists and

that the task imposed by *Daubert* is difficult in light of their comparative

lack of expertise.  *Id.* (citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 148

(1997)).    Nevertheless, the judge's relatively inexpert attention is

considered preferable to dumping a "barrage of questionable scientific evidence on a jury." *Id.* While this Court is aware of its duty as a gatekeeper, it understands that its role is not intended to supplant the adversary system or the role of the jury, and it recognizes that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (citing *Daubert*, 509 U.S. at 596).

The *Daubert* Court set out four nonexclusive factors that should be considered by a trial court assessing the reliability of expert scientific testimony under Rule 702: (1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review; (3) whether the technique has a high known or potential rate of error; and (4) whether the theory has gained general acceptance within the scientific community. *Id.* (citing *Daubert*, 509 U.S. at 595). Other factors that have been considered in conducting a *Daubert* analysis include reliance on anecdotal evidence (as in case reports), temporal proximity, and improper extrapolation (as in animal studies). *Allison*, 184 F.3d at 1312.

The primary focus of a *Daubert* inquiry is the principles and methodology underlying expert opinion testimony, not on the conclusions they generate. *Id*. (citing *Daubert*, 509 U.S. at 595). However, testimony based solely on the experience of the expert is not admissible. *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 157 (1999)). The trial court must be sure the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id*. Accordingly, the proponent of the testimony does not have the burden of proving that the testimony is scientifically correct, but that by a preponderance of the evidence, it is reliable. *Allison*, 184 F.3d at 1312; *see also Joiner*, 522 U.S. at 146 ("[C]onclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *Daubert*, 509 U.S. at 589–90 (Rule 703 requires

that the subject of an expert's testimony must be "scientific knowledge" and "knowledge" connotes more than a subjective belief or unsupported speculation; any inference or assertion must be derived by the scientific method to qualify as "scientific knowledge."). This scientifically valid connection between the opinion and the facts has also been called "analytical fit." *Rider*, 295 F.3d at 1197.

*Daubert* also requires a special inquiry into relevance, calling on the trial court to ensure that expert testimony logically advances a material aspect of the proposing party's case. *Allison*, 184 F.3d at 1312 (citing *Daubert*, 509 U.S. at 591). There must be a valid scientific connection between the testimony and the disputed facts in the case. *Id*. Furthermore, when expert opinion is based on otherwise inadmissible hearsay, *Daubert* establishes that Rule 703 requires the trial court to ensure that the underlying facts or data upon which the expert bases his opinion or inference are of the type reasonably relied upon by experts in the particular field. *Allison*, 184 F.3d at 1312. In the Eleventh Circuit, Rule 702 is said to govern only the scientist's "major premise" (the "principal, procedure, or explanatory theory derived by inductive, scientific technique") while Rule

703 addresses "the sources the expert may consult in collecting the case specific information to serve as the minor premise." *Allison*, 184 F.3d at 1313.

The Court has received sufficient information and explanation from both parties to allow it to determine whether the testimony of Dr. Rose, Dr. Goldsmith, Dr. Guidotti, Dr. Schriver, and Plaintiff as well as any co-worker witnesses is admissible under the *Daubert* framework.

B.     Vernon E. Rose, Ph.D.

According to Defendant, Dr. Rose seeks to offer the following opinions:(1) that Eastridge's workplace was not free from exposure to silica that was likely to cause serious harm; (2) that Norfolk Southern failed to provide adequate evaluation and control of potential silica; and (3) that OSHA's PELS are not designed to protect against all disease and that workers under the exposure face a risk of developing silicosis.  (Doc. 51 at 9 & 14.) Defendant argues that Rose's testimony is due to be precluded because he is not qualified to testify in this case and because the opinions he seeks to

offer are based on speculation rather than scientific knowledge.[7]  (Doc. 51 at 8.)

Plaintiff does not discuss nor present any evidence of the admissibility of Dr. Rose's testimony.  (Docs. 64 & 70.)  In his response to Defendant's motion to preclude testimony, Plaintiff does not even mention Dr. Rose; therefore, Plaintiff has implicitly conceded that Dr. Rose's testimony is due to be precluded.  The burden is on the plaintiff to affirmatively establish that his "proffered expert is qualified to render an expert opinion, that the opinion is reliable, and that the opinion would assist the trier of fact in resolving a disputed issue of material fact."  *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004).  Since there is absolutely no evidence that Dr. Rose is qualified to give an expert opinion on whether the workplace contained silica and whether Norfolk Southern adequately controlled this silica, his testimony must be stricken and disregarded.

---

[7]While Defendant argues that the majority of Rose's testimony is due to be precluded, Defendant does concede that some of Rose's opinions such as his opinion: that Eastridge could not have been exposed to respirable silica if he was not in the Sevier Yard, that it is not possible to determine the amount of silica in the air simply by looking at the environment, and that visible dust is not respirable would likely satisfy the *Daubert* standard.  (Doc. 51 at 8-9; Rose Dep. at 57-60, 126 & 140.)

Even if this Court were to assume that Dr. Rose has sufficient qualifications to testify about the exposure to silica, the Court agrees with Defendant that Eastridge has not presented evidence that Dr. Rose's testimony is reliable or relevant.[8] Dr. Rose has never been to a rail yard in his professional capacity, nor does he remember ever visiting the Sevier Yard. (Rose Dep. at 16.) Dr. Rose also testified that he has never done any air monitoring at any railroad facility in his professional capacity, nor has he every conducted an investigation of workplace exposures. *Id.* at 30, 37-38 & 173-74. In addition, Dr. Rose testified that he does not know whether Eastridge was exposed to silica above the OSHA permissible exposure limit. *Id.* at 56-57. Further, Dr. Rose testified that he did not rely on any studies or reports regarding the exposure of railroad workers to silica in connection with his opinions of this case. *Id.* at 143. Even Dr. Rose himself testified that he is in no position as to offer testimony regarding Eastridge's exposure. *Id.* at 57-60. Since Dr. Rose has never conducted tests at any rail

---

[8]Other courts have also rejected Dr. Rose's testimony because it was speculative, unreliable, and based on assumptions. *See Castellow v. Chevron USA*, 97 F. Supp. 2d 780, 798 (S.D. Tex. 2000); *Chambers v. Exxon Corp.*, 81 F. Supp. 2d 661, 665-66 (M.D. La. 2000); *Thomas v. A.P. Green Indus.*, 933 So. 2d 843, 858-59 (La. App. 2006).

yard as to the respirable silica in the environment nor relied on any studies or reports regarding this matter, the evidence does not establish that Dr. Rose based his opinion regarding Eastridge's exposure to silica on a reliable scientific method.   *See, e.g., Wintz v. Northrop Corp.*, 110 F.3d 508, 513 (7th Cir. 1996)(where the expert did not perform any tests or calculations concerning the amount of exposure, nor seek any information concerning the work environment in which plaintiff was exposed to bromide, the court held that the expert's testimony was not sufficiently based on scientific method to be admissible); *Korte v. ExxonMobil Coal USA, Inc.*, 164 Fed. Appx. 553, 557 (7th Cir. 2006).

In addition, Dr. Rose stated that he did not have sufficient information to render an opinion as to whether Norfolk Southern should have required its employees to wear respiratory protection.  (Rose Dep. at 163.)   This supports the conclusion that any opinion he rendered on this subject would be speculative and unreliable.

Further, in regard to the opinion that workers under the exposure limit face a risk of developing silicosis, Plaintiff has presented no evidence that

Dr. Rose's opinion regarding the OSHA limits[9] was based on a reliable method. Therefore, it appears that Dr. Rose lacks the scientific basis to express this opinion.

Thus, Defendant's motion to exclude Dr. Rose's testimony regarding Eastridge's exposure, Norfolk Southern's protections against exposure, and OSHA's PELS is due to be granted.

C.    David F. Goldsmith, Ph.D.

Plaintiff offers Dr. Goldsmith's expert opinion regarding silica in the workplace to discuss general causation and to link general causation to the specifics of the case.   (Doc. 64 at 14.)   Defendant argues that Dr. Goldsmith's testimony should be excluded because he has no basis for offering his epidemiological testimony that Eastridge was overexposed to respirable silica.  (Doc. 51 at 14.) While Plaintiff contends that he "does not intend to solicit from Dr. Goldsmith any opinions specific to the John Sevier

---

[9]The OSHA Act provides that:
> The Secretary, in promulgating standards dealing with toxic materials . . . . shall set the standard which most adequately assures, to the extent feasible, on the basis of the best available evidence, that no employee will suffer material impairment of health . . . even if such employee has regular exposure to the hazard dealt with by such standard.

29 U.S.C. § 655(b)(2007).

Yard or Eastridge's exposure to harmful levels of silica"  (Doc. 64 at 14),

Defendant argues that this concession is not sufficient and that Dr.

Goldsmith should be precluded from testifying generally about exposure to

respirable silica in the workplace.  (Doc. 70 at 4.)  Defendant contends that

there is no issue in this case as to whether sufficient exposure will cause

silicosis and that Dr. Goldsmith knows absolutely nothing about exposures

to silica in a railroad context.[10]  *Id.*

Federal courts "routinely allow expert witnesses to testify on

background matters, divorced from the specifics of . . . a particular case,

as being helpful to a jury."  *Fisher v. Ciba Specialty Chems. Corp.*, 2007 WL

2302470, at *3 (S.D. Ala. Aug. 8, 2007); *see also United States v. Pedroni*,

45 Fed. Appx. 103, 109 (3d Cir. 2002)(where the court permitted expert

witnesses to testify as to the taxing structure of motor fuel excise tax and

the methods of tax evasion, but not as to their opinion regarding plaintiff's

involvement in the conspiracy); *United States v. Mulder*, 273 F.3d 91, 101-

---

[10]According to Dr. Guidotti, in the practice of epidemiology, to reach a conclusion as to the likelihood of a disease being caused by a particular exposure in a craft, it is not necessary to refer to epidemiologic studies that are specific to the particular case at hand.  (Guidotti Dep. at 19.)

02 (2d Cir. 2001)(where court, in an extortion case, held that since the history, tactics, and goals of labor coalitions are not well known, expert testimony on this subject was appropriate); *United States v. Lewis*, 240 F.3d 866, 869-70 (10th Cir. 2001)(where expert testified as to the general requirements regarding commercial hunting licenses under Oklahoma law, but not whether plaintiff's conduct violated those requirements, the court held that expert testimony was permissible); *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)(a professor's testimony regarding general background information of federal securities regulation and filing requirements of Schedule 13D to clarify ambiguity in instructions on a blank Schedule was admissible in prosecution for securities fraud, regardless of the fact that the professor answered a few questions based on hypotheticals); *United States v. Naegele*, 471 F. Supp. 2d 152, 160 (D.D.C. 2007)(where the court allowed two bankruptcy attorneys to offer their expert opinion regarding bankruptcy proceedings in general and the Chapter 7 bankruptcy filing process).  A party "is free to offer expert testimony both as background . . . and to assist in proving one or more elements. . . ." *Mulder*, 273 F.3d at 102.

Here, the Court must examine Dr. Goldsmith's qualifications as well as the reliability and relevance of his testimony.  Dr. Goldsmith is an Environmental and Occupational Epidemiologist and Associate Research Professor in the Department of Environmental and Occupational Health at George Washington University.  (Goldsmith Dep. at 4-6.)  Before joining the staff at George Washington University, Dr. Goldsmith was a member of the staff at the Public Health Institute, where his research focused on pesticides and health, silica dust exposure and health, and other occupational and environmental health research projects.  *Id.* at 7.  Based on Dr. Goldsmith's occupation, experience, and research, it appears that Plaintiff has presented sufficient evidence that Dr. Goldsmith is qualified to testify about silica dust exposure and the health effects from such exposure.

Next, the Court must consider the reliability and relevance of Dr. Goldsmith's testimony.  Plaintiff is offering Dr. Goldsmith's expert testimony in order to establish the background on silica, its toxicity, and the health consequences of harmful exposure.  Since parties are permitted to offer expert testimony on background matters, Dr. Goldsmith's testimony as to these issues is entirely proper and permissible.  *See Mulder*, 273 F.3d at 102;

*Fisher,* 2007 WL 2302470, at *3-4.  In addition, this testimony will provide the trier of fact with background that will enable them to understand silica, its effect in the workplace, and the consequences resulting from a harmful exposure to it.  Since the purpose of Dr. Goldsmith's testimony is to provide the trier of fact with an understanding of his specialized knowledge regarding silica dust, it is apparent that there is a benefit to receiving this information about silica, its toxicity, and the health consequences in order to understand Plaintiff's alleged injury.  Therefore, while Dr. Goldsmith will not be permitted to testify as to any specific opinions regarding the John Sevier Yard or Plaintiff's exposure to harmful levels of silica, Dr. Goldsmith's background testimony regarding silica is properly admissible.

Defendant contends that Dr. Goldsmith relied exclusively on another expert's testimony to reach his conclusions and should thereby be precluded from testifying.  (Doc. 51 at 17.)  An expert who does not perform his own investigation nor assess the validity of the findings but rather relies solely on the findings of other experts should be precluded from testifying on such matters to which he relies solely on other expert's findings since his methodology is not calculated to produce reliable results under *Daubert*.

*See In re TMI Litig.*, 193 F.3d 613, 715-16 (3d Cir. 1999)(where expert reviewed the reports of other experts and offered an opinion based on his review as to the radiation exposure of the residents as a result of the reactor).   Since Dr. Goldsmith relied solely on the testimony of Plaintiff and the findings of another expert regarding Plaintiff's exposure and the risk of exposure at the Sevier Yard, found no epidemiological literature suggesting that locomotive engineers may be at risk of contracting silicosis, and performed no independent investigation of the rail yard, Dr. Goldsmith does not have sufficient knowledge or expertise to make a projection about Plaintiff's exposure or about the risk of exposure at the John Sevier Yard (Goldsmith Dep. at 29-33, 54, 148-49 & 154.)  Dr. Goldsmith may not simply repeat the opinions of other experts in the case; therefore, he is precluded from testifying as to Plaintiff's exposure or the risk of exposure at the Sevier Yard.  However, it appears that Dr. Goldsmith's opinions, which are formed based on the opinions of other experts, regard case specific matters. Plaintiff is offering Dr. Goldsmith's testimony not for any case specific opinions but rather for the underlying background of silica exposure. Therefore, Dr. Goldsmith is not qualified to testify and will thereby be

precluded from testifying as to any case specific opinions; however, his testimony concerning background information on silica will be permitted.

D.    Tee L. Guidotti, M.D.

Plaintiff offers Dr. Guidotti's expert opinion that Eastridge has silicosis. Defendant argues that any testimony of Dr. Guidotti regarding a diagnosis of silicosis or Eastridge's exposure to respirable silica should be precluded.[11]  (Doc. 51 at 21.)

The Court must examine Dr. Guidotti's qualifications as an expert, as well as the reliability and relevance of his testimony.  In regard to his

---

[11]Defendant argues that Dr. Guidotti should be precluded from testifying as to Eastridge's alleged exposure to respirable silica since he has never been to a rail yard in conjunction with an investigation or testing of silica exposure; he is not aware of any epidemiological studies concerning locomotive engineers' exposure to silica; and he did not rely on any scientific evidence or evaluations relating to the alleged exposures.  (Doc. 51.)  While Defendant states that Dr. Guidotti testified that he had no intention of offering testimony as to Eastridge's exposure to silica (Doc. 51 at 25), Defendant contends that Norfolk Souther addressed this subject out of caution.

When a party offers an expert's testimony, that party has the burden of establishing that the expert is sufficiently qualified, used reliable methods to reach his conclusions, and that the testimony will assist the trier of fact.  *See McDowell*, 392 F.3d at 1298.  Here, Plaintiff has offered no evidence that Dr. Guidotti is qualified to testify as to Eastridge's exposure. (Doc. 64 at 3.)  In addition, Dr. Guidotti testified that he was retained to testify solely as to the causation and diagnosis involved in the case. (Guidotti Dep. at 16.)  Since there is no evidence establishing that Dr. Guidotti is qualified to give an expert opinion on Plaintiff's exposure, his testimony as to the exposure will be excluded.  Thus, this Court will focus on the issue of whether Dr. Guidotti should be allowed to testify as to the diagnosis of silicosis.

qualifications, Dr. Guidotti is a professor of occupational and environment

medicine  and chair of the Department of Environmental and Occupational

Health at George Washington University School of Public Health and Health

Services.  (Guidotti Dep. at 5.)  He is board certified in internal medicine,

pulmonary disease, and occupational medicine; has a non-medical board

certification in toxicology; is certified in environmental management, and

is a specialist in lung disease.  *Id.* at 8.  In addition, Dr. Guidotti has been

involved as an expert witness in numerous cases involving pneumoconiosis.

*Id.* at 31-32.  Further, he has acted as an expert in two railroad cases prior

to this case; however, those cases dealt with ergonomics and acute lung

diseases.   *Id.*  at 13-14.   Dr. Guidotti  reviewed  various  materials  and

publications in preparing his opinion including two health hazard evaluation

reports done by the National Institute for Occupational Health and Safety,

one of which was done on Norfolk Southern studying silica exposure among

maintenance of way workers, and a Chinese study of silica treatment among

railroad workers.  *Id.* at 132-134.  While Defendant argues that none of the

evidence upon which Dr. Guidotti relies provides a proper foundation for him

to offer the opinion that Eastridge has silicosis or of Eastridge's exposure to

silicosis,[12] Dr. Guidotti appears to have experience in pneumoconiosis, both

as a medical professional and as an expert in preparation for litigation. *Id.*

at 8-9 & 32-33. Therefore, the majority of the Court's analysis will focus on

the reliability and relevance of his testimony.

The Court must examine the methodology Dr. Guidotti employed to

reach his conclusions that Eastridge suffered from silicosis. Plaintiff does

not have to prove that Dr. Guidotti's conclusions are correct, but he does

have the burden of proving that the testimony and his methodology are

based on a proper scientific method and are therefore reliable. *See, e.g.,*

*Allison*, 184 F.3d at 1312. This reliability inquiry requires an "objective,

independent validation of the expert's methodology." *Moore v. Ashland*

---

[12]While Defendant made this one sentence conclusory argument, Defendant does not
expressly argue that Dr. Guidotti is not qualified to testify nor does it provide any legal
support for its contention that Dr. Guidotti is not qualified to testify as an expert. Since
Defendant has not elaborated on its position or provided legal authority to support its
position, this Court need not analyze this issue. *See U.S. Steel Corp. v. Astrue*, 495 F.3d
1272, 1287 (11th Cir. 2007)(where appellants argued that the SSA acted arbitrarily and
capriciously but did not provide legal authority to support their argument or elaborate
upon their argument, the court stated that it would "not address this perfunctory and
underdeveloped argument"); *see also Flanigan's Enters., Inc. v. Fulton County, Ga.*, 242
F.3d 976, 987 n.16 (11th Cir. 2001) (holding that a party waives an argument if the party
"fail[s] to elaborate or provide any citation of authority in support" of the argument);
*Ordower v. Feldman*, 826 F.2d 1569, 1576 (7th Cir. 1987) (stating that an argument made
without citation to authority is insufficient to raise an issue before the court).

*Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

In determining the reliability of Dr. Guidotti's testimony, the Court will focus on the accepted criteria for diagnosing silicosis.  The accepted method for diagnosing silicosis requires: "(1) an adequate exposure to silica dust with an appropriate latency period, (2) radiographic evidence of silicosis, and (3) the absence of any good reason to believe that the radiographic findings are the result of some other condition (i.e., a differential diagnosis)."  *In re Silica Products Liab. Litig.*, 398 F. Supp.2d 563, 622 (S.D. Tex. 2005)(citing Hans Weill, et al., *Silicosis and Related Diseases, in* OCCUPATIONAL LUNG DISORDERS 286 (3d ed. 1994); Daniel E. Banks, *Silicosis, in* TEXTBOOK OF CLINICAL OCCUPATIONAL AND ENVIRONMENTAL MEDICINE 380-81 (2d ed. 2005)).

In regard to sufficient exposure, an adequate exposure history means that the physician or his agent has taken or gotten a history of exposure to potentially toxic substances, such as organic dust, inorganic dust, or sand, from the patient and has determined that the intensity and duration of such exposure was at least potentially sufficient to explain the radiographic findings.  *See In re Silica Products Liab. Litig.*, 398 F. Supp. 2d at 590.

Here, Dr. Guidotti relied on the records of physicians at the University of

Tennessee and the Knoxville Pulmonary Group, who took Plaintiff's history

and concluded that "as a locomotive engineer, Mr. Eastridge . . . was

exposed to silica dust."  (Guidotti Dep. Pla. Ex. 2 at 3.) For example, one

exposure history upon which Dr. Guidotti relied was that of Dr. Schriver,[13]

Plaintiff's treating physician, who took Eastridge's history of exposure to

sand while working at the Sevier Yard.  (Schriver Dep. at 20.)  Dr. Schriver

noted that Plaintiff told her that "he had been exposed to a lot of dust from

sand being placed on the railroad tracks to improve traction;" that he had

worked multiple shifts for 29 years and "thus had more dust exposure than

an average employee;" and that Eastridge had given her a history of

"significant sand and silica exposure." *Id*. at 11 & 15.  In addition, in order

to form his opinion,  Dr. Guidotti reviewed a stack of medical records

provided by Dr. Schriver as well as her deposition.[14]  *Id*. at 117.  Based on

[13]Dr. Schriver practices with the Knoxville Pulmonary Group.  (Schriver Dep. at 4.)

[14]In forming his opinion, Dr. Guidotti reviewed various information provided to him. *See* (Guidotti Dep. at 110-131.)  In addition to reviewing the medical records and physician's depositions, he also read the depositions of Plaintiff, Wanda Eastridge, Thomas Rowe, Mark Dudle, and Plaintiff's coworkers; and the affidavits of Robert Kirkland and J.P. Barker.  (*Id*. at 49, 56 & 110; Guidotti Dep. Pla. Ex. 2 at 3.)  He also relied on the testimony of the safety and hygiene experts, who confirmed, always explicitly or with

this information, Dr. Guidotti opined that the patient's history indicated an adequate exposure history.[15]  (Guidotti Dep. Pla. Ex. 2 at 3.)  Since this exposure history was taken by a physician, who had medical training and treated Plaintiff, Dr. Guidotti could rely upon it in forming his opinion regarding Plaintiff's diagnosis.  *See In re Silica Products Liab. Litig.*, 398 F. Supp. 2d at 624-25 (where the exposure histories were taken by people without medical training who had financial incentives to find exposure to silica, the court held that the experts' diagnoses failed to satisfy the medically accepted criteria for diagnosing silica because there was not an appropriate exposure history since the histories upon which the experts relied were not taken by physicians).

In addition, in order to diagnose silicosis, there must be an appropriate chest x-ray.  *See In re Silica Products Liab. Litig.*, 398 F. Supp.

---

great quantitation, the presence of silica at the site.  (Guidotti Dep. at 56.)  Dr. Guidotti stated that he watched a short video of the Sevier Yard in which he was able to observe some airborne particles drifting from the facility, and relied on the confirmatory evidence from this video.  *Id.* at 46-49.  Further, he stated that the clinical features of this case are consistent with silicosis. *Id.*

[15]Dr. Guidotti stated that Plaintiff was "exposed to much silica dust from sand" when it was used for traction of the tracks, filled into the engine, and loaded into the hopper as described in Eastridge's deposition.  (Guidotti Dep. Pla. Ex. 2 at 3.)  Dr. Guidotti stated that this exposure was confirmed by Kirkland, Pugh, Rowe, and Mrs. Eastridge.

2d at 590-91.  Defendant argues that a diagnosis for a pneumoconiosis, such as asbestosis or silicosis, "*should* only be made by a properly qualified physician who has reviewed available x-rays and CT's to reach his opinion." (Doc. 51 at 22.)  Since Dr. Guidotti did not personally look at these x-rays or CT scans, Defendant contends that he should be precluded from testifying.  *Id.*  However, the information to which Defendant points does not *require* the physician to personally look at the x-rays and CT's, rather, it states that these are extremely useful tools in diagnosing the patient. (*See* Schriver Dep. Ex. 4 at 696.)  Defendant also points to the testimony of his proffered expert which states that "[i]t is not appropriate for a physician to make a diagnosis of pneumoconiosis . . . without personally looking at x-rays and CT scans where they are available."   (Goldstein Aff. at 3.) However, while Dr. Goldstein states that it is not appropriate, he does not support this statement with either medically accepted or legal authority requiring a physician to personally look at the x-rays and CT scans rather than rely on a radiologist report.  Therefore, the evidence presented does not appear to indicate that the established methodology for diagnosing a pneumoconiosis actually requires the physician to personally look at the

films.

While Dr. Guidotti has not personally looked at any chest x-rays or CT scans, he has examined several radiology reports in the record. (Guidotti Dep. at 27, 29.) As a specialist in lung disease, Dr. Guidotti reads test films for various reasons and can therefore read the radiology reports. *Id.* at 8. He states that "[i]t's not necessarily important for me personally to look at the films as long as I have an accurate description of what the film shows." *Id.* at 29. Since he knows the conventions of radiologists, he can read the comments of the radiologists and understand what the scan actually shows. *Id.* at 30. For example, radiologists typically don't comment on what does not appear on the scan; therefore, in reading the radiology report, while someone not familiar with the conventional terms of radiologists might assume that the radiology report is silent on that issue, Dr. Guidotti knows "that it wasn't present on the film."[16] *Id.* at 30-31. In addition, Dr.

---

[16]Dr. Guidotti gave the following example regarding reading into a radiology report:
  I think a very good example would be pleural plaques. A large conspicuous pleural plaque would not be expected on a normal film and it would not normally be present on a film with somebody with silicosis. If the radiologist does not say that there's a pleural plaque there, then one can safely assume that a pleural plaque wasn't there.
  Likewise, blunting of the costophrenic angle, that's a finding that would immediately draw the attention of a radiologist on a chest film or whoever

Guidotti testified that it was not necessary to examine Plaintiff in order to diagnose him because Eastridge had a very detail-oriented pulmonary physician; therefore, the medical record was sufficient to allow him to make a diagnosis. *Id.* at 109.

In arriving at a diagnosis, it is perfectly acceptable "for a physician to rely on examinations and tests performed by other medical practitioners." *Kannankeril v. Terminix Intern., Inc.,* 128 F.3d 802, 807 -809 (3d Cir. 1997)(stating that differential diagnosis "may consist of the performance of physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests;" however, a physician is not required to employ all of these techniques for the physician's diagnosis to be reliable); *see also Roberts v. Fleury*, 987 F. Supp. 940 (D. Md. 1997)(where court noted that in modern medicine, a physician could rely on the pathology reports sent to him by another expert unless there is hard data accompanying the report unequivocally establishing the unreliability of the report); FED. R. EVID. 703 1972 advisory committee's note (noting that

---

else is qualified to read the chest film.  So they would comment on it if it were present.
(Guidotti Dep. at 30-31.)

a physician bases his diagnosis on information from numerous sources "including statements by patients and relatives, reports and opinions from nurses, technicians and other doctors, hospital records, and X rays;" and "[h]is validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes"). In addition, a "consulting physician" may rely "on information developed by other medical practitioners contained in the patient's medical records, such as medical history, laboratory tests, and x-rays." REFERENCE MANUAL ON SCI. EVID. 449-50 (Federal Judicial Center, 2d ed. 2000). Therefore, it was acceptable for Dr. Guidotti to review the radiology reports and other clinical findings in forming his opinion. The evidence offered by Defendant shows, at most, that a jury could discredit Dr. Guidotti's diagnosis since he did not personally read the x-rays and CT scans.

Finally, before there can be a diagnosis of silicosis, a physician must rule out other diseases. This can be done by differential diagnosis or by considering the occupational, exposure, and past medical history of the patient. *See In re Silica Products Liab. Litig.*, 398 F. Supp. 2d at 590-91, 629 (stating that it is generally accepted that the final criterion, *i.e.*, the

absence of any good reason to believe the positive radiographic findings are the result of some other condition, can be established through differential diagnosis).  Here, Dr. Guidotti applied the method of differential diagnosis to reach his conclusion that Eastridge suffers from silicosis.  (*See* Guidotti Dep. at 57.)  In toxic tort cases, courts have held that differential diagnosis, when performed properly, is a valid method for forming an opinion.  *See McClain v. Metabolife Intern., Inc.,* 401 F.3d 1233, 1252 (11th Cir. 2005)(stating that under circumstances that ensure reliability, differential diagnosis "may offer an important component of a valid methodology"); *In re Silica Products Liab. Litig.*, 398 F. Supp. 2d at 590-91, 629; David L. Faigman et al., MODERN SCIENTIFIC EVID.: THE LAW & SCIENCE OF EXPERT TESTIMONY § 21:4 (2007).

"Differential diagnosis involves 'the determination of which one of two or more diseases or conditions a patient is suffering from, by systematically comparing and contrasting their clinical findings.'"[17] *McClain,* 401 F.3d at

---

[17]According to the Eleventh Circuit,
> The more precise but rarely used term [for differential diagnosis] is differential etiology, which is "a term used on occasion by expert witnesses or courts to describe the investigation and reasoning that leads to the determination of external causation, sometimes more specifically

1252 (citing DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 240, (Douglas M. Anderson et al. eds., 29th ed. 2000).[18]  Differential diagnosis "leads to the diagnosis of the patient's condition, not necessarily the cause of that condition."   *Id.*   A reliable differential diagnosis "may consist of the performance of physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests;" however, a physician is not required to employ all of these techniques for the physician's diagnosis to be reliable. *Kannankeril*, 128 F.3d at 807 (stating that it was perfectly acceptable for a physician to rely on examinations and reports of

---

> described by the witness or court as a process of identifying external causes by a process of elimination." *See* Mary Sue Henifin et al., *Reference Guide on Medical Testimony*, *in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 439, 481 (Federal Judicial Center, 2d ed. 2000).

*McClain*, 401 F.3d at 1252.

[18]A valid differential diagnosis will only satisfy a *Daubert* analysis "if the expert can show the general toxicity of the drug by reliable methods." *McClain.,* 401 F.3d at 1253. While differential diagnosis will not "overcome the fundamental failure of laying a scientific groundwork for the general toxicity of the drug and that it can cause the harm a plaintiff suffered," the medical community in toxic tort cases generally recognizes the toxicity of the drug or chemical in certain cases.  *Id.* at 1239.  An example of the type of case where the medical community recognizes the toxicity of the drug or chemical and that it can cause the harm the plaintiff suffered includes "silica, which causes silicosis." *Id.* Since this case involves a diagnosis of silicosis as a result of exposure to silica, Plaintiff does not have to lay the groundwork of the general toxicity of the chemical since the medical community recognizes silica as a toxin.  Thus, since the general toxicity of silica is medically recognized, indicating a reliable explanation of how silica causes silicosis, a foundation for the differential diagnosis analysis in this case has been laid and differential diagnosis may serve as a reliable basis for an expert opinion.

other doctors); *see also CSX Transp., Inc. v. Miller*, 858 A.2d 1025, 1073 (Md. App. 2004*)*.

To support his diagnosis of silicosis,[19] Dr. Guidotti discussed in detail the manner in which he conducted the differential diagnosis of this case. (Guidotti Dep. at 56-107).   Dr. Guidotti stated that "the differential diagnosis of fibrotic lung disease is large."  *Id*. at 57.   In performing the differential diagnosis, he considered the medical records, the clinical reports, deposition testimony, and various other evidence.  *Kannankeril*, 128 F.3d at 807 (stating that "a physician may reach a reliable differential diagnosis without himself performing a physical examination"); *see also CSX Transp., Inc.*, 858 A.2d at 1073 (stating that a reliable differential diagnosis is performed after physical exams, taking medical history, and reviewing clinical reports).  Based on this information, Dr. Guidotti compiled a list of the possible causes and diseases that might explain the clinical findings of this case.   In looking at the clinical features of the case, Dr. Guidotti explained how he was able to eliminate various possible diagnoses and was

---

[19]Dr. Guidotti also laid out his diagnostic criteria for silicosis, stating that he looks at the compatible diseases, the history of exposure, and rules out other consistent diagnoses before making a determination of silicosis.  (Guidotti Dep. at 185-87.)

left with the diagnosis of silicosis.[20]   (Guidotti Dep. At 56-59).    In his

findings, Dr. Guidotti discussed various other diseases such as idiopathic

interstitial fibrosis, asbestosis, coal workers' pneumoconiosis, and other

diseases related to diesel fumes, mold, and other antigens and explained

why he eliminated these possible diseases, stating that the clinical features

of Eastridge's case indicated that he did not suffer from such diseases.

(Guidotti Dep. at 56-84, 107; Guidotti Dep. Pla. Ex. 2 at 5.) *See Yarchak v.*

*Trek Bicycle Corp.,* 208 F. Supp. 2d 470, 497-99 (D.N.J. 2002)(stating that

a "reliable differential diagnosis must specifically negate other alternative

possible causes"). In addition, in ruling out the other possible causes of the

clinical reports, Dr. Guidotti took into account Eastridge's exposure history.

(Guidotti Dep. Pla. Ex. 2; Guidotti Dep. at 186.) *See In re Silica Products*

---

[20]In Dr. Guidotti's Report to Mr. Bradley, he stated that:
> Eastridge's disease is entirely consistent with silicosis.  Silicosis, which usually begins at the top of the lungs, progresses with scarring of lung tissue which becomes much more severe at the bottom of the lungs, as in Mr. Eastridge's case.  His pulmonary function studies are characteristics of pneumoconioses in general and consistent with silicosis in particular. Failure to recover silica particles in bronchopulmonary lavage does not rule out silicosis.  Given the history of probable heavy silica exposure, there is no reason to doubt that this is silicosis, despite the lack of biopsy-obtained tissue evidence.

(Guidotti Dep. Pla. Ex. 2 at 4.)

*Liab. Litig.*, 398 F. Supp. 2d at 631-32 (stating that it is "vitally important for a physician to take a thorough occupational/exposure history" in order to perform a competent differential diagnosis).  After considering all of the evidence and comparing the clinical findings, Dr. Guidotti ruled out all other possible causes and concluded that Eastridge suffers from silicosis.    Thus, in utilizing differential diagnosis to reach an opinion as to Plaintiff's diagnosis, Dr. Guidotti followed the established method for performing differential diagnosis by considering all possible diagnoses and systematically eliminating each diagnosis that did not apply to the case at hand until he was left with a diagnosis that conformed to Eastridge's clinical features.    Thus, Defendant's motion to preclude the testimony of Dr. Guidotti regarding a diagnosis of silicosis is due to be denied.

E.    Elise Schriver, M.D.

Defendant contends that Plaintiff will offer Dr. Schriver's expert opinion that Eastridge was overexposed to respirable asbestos fibers or respirable silica and that because of Plaintiff's overexposure, he suffers from asbestosis or silicosis.  (Doc. 51 at 25; Doc. 70.)  Defendant argues that Schriver's opinion should be precluded because she has no basis from a

scientific perspective to discuss Eastridge's exposures.  (Doc. 51 at 26.)

In regard to testimony concerning Plaintiff's overexposure to silica or asbestos, Plaintiff concedes that he "does not intend to solicit any opinions from Dr. Schriver as to whether [Eastridge] 'was overexposed to respirable asbestos fibers or respirable silica." (Doc. 64 at 16.)  In addition, the evidence establishes that Dr. Schriver did not perform any independent research to determine whether locomotive engineers were at risk of overexposure to asbestos; all of the information she had about Plaintiff's exposure was based on his own history; and she relied on her own common sense in forming her opinions regarding Plaintiff's exposure.  (Schriver Dep. at 20, 34.)  Since Plaintiff conceded that Dr. Schriver will not testify as to whether Plaintiff was overexposed to respirable asbestos or silica (Doc. 64 at 16) and since there is absolutely no evidence that Dr. Schriver is qualified to give an expert opinion as to whether Eastridge was overexposed, it is apparent that Plaintiff has not met his burden of establishing that Dr. Schriver is qualified to testify as to this matter.  *See McDowell*, 392 F.3d at 1298.   Therefore, Dr. Schriver will be precluded from testifying as to whether Eastridge was overexposed to respirable asbestos fibers or

respirable silica.

Defendant also argues that if Plaintiff "intends to solicit a diagnosis of either asbestosis <u>or</u> silicosis from Dr. Schriver, that diagnosis must be based on a reliable history of sufficient exposure.  Without a reliable history of sufficient exposure, the diagnosis of either asbestosis (which plaintiff now agrees is not a correct diagnosis) or silicosis **cannot be made**."[21]  (Doc. 70 at 5.)  To determine what was the cause of Plaintiff's lung disease, Dr. Schriver applied her experience as a board certified physician in internal medicine, pulmonary medicine, and critical care medicine; relied on her experience of diagnosing and treating previous patients with asbestosis; examined the Plaintiff; and studied the Plaintiff's clinical reports.  (Schriver Dep. at 9-20, 23.)

Dr. Schriver is a pulmonologist and critical care physician.  (Schriver Dep. at 4.)  In order to treat Plaintiff, Dr. Schriver performed a physical

---

[21]While Defendant argued in its Motion to Preclude Testimony that Dr. Schriver should be precluded from testifying about Eastridge's alleged overexposure, it did not argue that Dr. Schriver's diagnosis should be precluded.  "[I]t is generally improper to raise new arguments for the first time in a reply brief. It would be unfair and improper to consider these newly raised arguments at this time, when defendants could have raised them earlier and plaintiffs have not had an opportunity to be heard on them."  *Fisher*, 2007 WL 2302470, at *4.  Therefore, this argument is not properly submitted.

exam of the patient, examined his chest x-rays and CAT scans, studied his pulmonary function studies, and took into account his history. *Id.* at 12. Based upon this information, she is of the opinion that there is a greater than 50 percent chance that Plaintiff's lung disease is a result of asbestosis. *Id*. at 9.  In diagnosing Plaintiff with asbestosis, Schriver testified that it was his history of asbestos exposure that made her the most concerned. *Id*. at 10; *see In re Silica Products Liab. Litig.*, 398 F. Supp. 2d at 590 (stating in order to diagnose a patient with a type of pneumoconiosis, there must be a sufficient history of exposure; this history of exposure is appropriately taken by a physician who obtains the history from the patient).  She also testified that his clinical picture was compatible with asbestosis.  (Schriver Dep. at 11.)

While Dr. Schriver will be precluded from testifying as to whether Plaintiff was overexposed to respirable asbestos or respirable silica, she will be allowed to testify as to the matters that are within her knowledge and expertise, specifically including matters regarding her activities as his treating physician.  Therefore, Dr. Schriver will be allowed to offer her opinion as to the diagnosis of Plaintiff's disease.

Thus, Defendant's motion to exclude Dr. Schriver's testimony that Plaintiff was overexposed to respirable asbestos or respirable silica is due to be granted, but any motion to exclude Dr. Schriver's testimony concerning the diagnosis and treatment is due to be denied.

F.    Plaintiff and any co-worker witnesses.

Defendant argues that neither Plaintiff nor any of his co-workers (1) are qualified to testify nor (2) do they have personal knowledge as to whether Plaintiff was actually exposed to either respirable asbestos or respirable silica during his employment with Norfolk Southern.  (Doc. 51 at 27.)

In order to offer an expert's opinion, the burden is on the plaintiff to affirmatively establish that his expert has suitable qualifications. *See, e.g.*, *McDowell*, 392 F.3d at 1298.  Plaintiff does not offer any evidence that Plaintiff or any of his co-workers have suitable qualifications.  Instead, Plaintiff concedes that neither Eastridge nor his co-workers "will be asked to express any opinions but will be asked only to proffer factual testimony regarding events and conditions at the John Sevier Yard.  They will be called solely as lay witnesses."  (Doc. 64 at 16.)  Since Plaintiff has failed to offer

evidence tending to show that Eastridge or his co-workers are qualified or even that they will testify as expert witnesses, Plaintiff's and his co-workers' testimony that the materials to which they were exposed contained asbestos or silica must be disregarded.

In addition, with regard to personal knowledge, Eastridge testified that he did not have personal knowledge that there was asbestos in the locomotive, rather his statements regarding asbestos and silica were based on what other people had said.   (Eastridge 9/13/05 Dep. at 89-90.) Therefore, Plaintiff himself has admitted that he does not have the personal knowledge to testify as to whether he was actually exposed to respirable asbestos or silica during his employment.   Plaintiff will therefore be precluded from testifying as to whether he was actually exposed, except for any factual description of what he witnessed while employed.

Thus, Defendant's motion to preclude Plaintiff and his co-workers from testifying as experts is due to be granted.

IV.    Motion for Summary Judgment.

A.    Standard of Review.

Summary judgment is proper "if the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23.  In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party.  *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,'

designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d at 1224 (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

"[A]t the summary judgment stage the judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249 (1986).  However, judges are not "required to submit a question to a jury merely because some evidence has been introduced by a party having the burden of proof, unless the evidence be of such character that it would warrant the jury finding a verdict in favor of that party." *Id.* at 251 (*quoting Wilkerson v. McCarthy*, 336 U.S. 53, 62 (1872)).  "This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under governing law, there can be but one reasonable conclusion as to the verdict." *Id.* at 250.

B.     Discussion.

The complaint alleges that Norfolk Southern violated FELA by failing to provide him with a safe place to work; failing to provide him with appropriate safety equipment; and failing to warn him of the dangers of silica exposure.[22] Defendant contends that it is entitled to summary judgment on Plaintiff's claim.  The Court will address the claim below.

The Federal Employers' Liability Act ("FELA") provides a statutory cause of action for railroad employees' injuries.[23]  *See Norfolk Southern Ry. Co. v. Sorrell*, 127 S.Ct. 799, 805 (2007).  FELA is to be liberally construed.

---

[22]In response, Defendant claims that (1) Norfolk Southern provided Plaintiff with a safe place to work; (2) there was no need to provide additional safety equipment or warnings about silica because he was not exposed to harmful levels; and (3) Eastridge's lung disease is not related to his employment with Norfolk Southern.  (Doc. 62.)

[23]With the enactment of FELA, courts have held that Congress desired to "secure jury determinations in a larger portion of cases than would be true of ordinary common law actions." *Boeing Co. v. Shipman*, 411 F.2d 365, 371 (5th Cir. 1969), *overruled on other grounds by Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir. 1997).  Therefore, courts have held that in FELA actions, a "plaintiff need only present a minimum amount of evidence in order to defeat a summary judgment motion."  *Hines v. Consol. Rail Corp.*, 926 F.2d 262, 268 (3d Cir. 1991)(citing *Pehowic v. Erie Lackawanna R.R.*, 430 F.2d 697 (3d Cir. 1970)(stating that "a trial court is justified in withdrawing . . . issue[s] from the jury's consideration only in those extremely rare instances where there is a zero probability either of employer negligence or that any such negligence contributed to the injury of an employee")); *see also Allen v. Seacoast Products, Inc.*, 623 F.2d 355, 360 (5th Cir. 1980)(stating that a directed verdict against the plaintiff in a FELA action is only appropriate "when there is a complete absence of probative facts supporting the plaintiff's position"); *Boeing Co.*, 411 F.2d at 370.

*See Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 543 (1994). However, the statute "does not make the employer the insurer of the safety of his employees while they are on duty." *Id.*

> The Act provides:

> Every common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51 (2007).  The basis of an employer's liability under FELA is his negligence,[24] not the mere fact that the injury occurred.  *See Gottshall*, 512 U.S. at 543.  The elements of a claim arising under FELA "are determined by reference to common law."[25]  *Sorrell*, 127 S.Ct. at 805.  Therefore, in order to prevail for a claim under FELA, the plaintiff must establish the

---

[24]For purposes of FELA, what constitutes negligence is a federal question.  *See Urie v. Thompson*, 337 U.S. 163, 174 (1949).

[25]Under FELA, common law principles apply to claims, absent express statutory language to the contrary.  *See Sorrell*, 127 S.Ct. at 807.  FELA has been held to expressly depart from common law in the following ways: "it abolished the fellow servant rule, rejected contributory negligence, prohibited employers from contracting around the Act, and abolished the assumption of the risk defense." *Id.*

elements of negligence, including duty, breach of duty, foreseeability, and causation.  *See Adams v. CSX Transp., Inc.*, 899 F.2d 536 (6th Cir. 1990).

When caused by the employment, occupational diseases such as silicosis constitute compensable physical injuries under FELA; however, Plaintiff must establish that Defendant's negligence caused his silicosis.[26] *See Urie,* 337 U.S. at 181; *Gottshall,* 512 U.S. at 543.

      1.    Duty.

Pursuant to FELA, a railroad company has a duty to provide its employees with a reasonably safe work environment.  *See Shenker v. Baltimore & Ohio R.R.*, 374 U.S. 1, 7 (1963); *Williams v. Atl. Coast Line R. Co.*, 190 F.2d 744, 747 (5th Cir. 1951).  The railroad company must use reasonable care in fulfilling this duty.  *Id.*  The reasonableness of care "depend[s] upon the danger attending the place or the machinery" where

---

[26]Under this theory of recovery, Plaintiff reasons as follows: FELA imposes a duty upon Norfolk Southern to provide a safe place to work; because Plaintiff worked in a non-air-conditioned machine, it was operated with the windows down; and because the windows were down and there were small holes in the floor, silica dust, which was generated when sand was used to create traction between the wheels and the rails, would blow into the cab where Plaintiff worked; and because large amounts of silica dust escaped from the dust collector, Plaintiff was exposed to clouds of silica dust; because of this exposure, Norfolk Southern was not a safe place to work nor did it provide suitable equipment; therefore, Norfolk Southern breached this duty.

the railroad employee is working.  *See Williams*, 190 F.2d at 747 (citing

*Bailey v. Cent. Vt. Ry.*, 319 U.S. 350, 353 (1943)(citation omitted)(stating

that the employer's duty to use reasonable care "becomes 'more

imperative' as the risk increases")).  The Supreme Court continues by

stating that "[o]rdinary care must be in proportion to the danger to be

avoided and the consequences that might reasonably be anticipated from

the neglect. . . . It must be commensurate with known dangers." *Urie,* 337

U.S. at 179-80 (citations omitted).

      2.    Breach of Duty.

While the existence of a railroad employer's duty can be determined

as a matter of law, the question of whether negligence attaches is generally

better left to determination by a jury.  *See Wilkerson*, 336 U.S. at 61;

*Bailey*, 319 U.S. at 353-54.

Under FELA, a railroad employer breaches its duty "if it knew or should

have known of a potential hazard in the workplace, and yet failed to

exercise reasonable care to inform and protect its employees." *Williams v.*

*Long Island R.R. Co.*, 196 F.3d 402, 406 (2d Cir. 1999); *see also Urie*, 337

U.S. at 178 (stating that negligence attaches if a railroad employer "knew,

or by the exercise of due care should have known, that the prevalent standards of conduct were inadequate to protect the plaintiff or other employees).   FELA holds railroads to a prudent person standard of care, so in order to show that a railroad breached its duty, the plaintiff must establish circumstances that a reasonable person would foresee as creating a potential harm.  *See Atlantic Coast Line R. Co. v. Johnson*, 199 F.2d 750, 751 (5th Cir. 1952).

In this case, Plaintiff has presented evidence that Norfolk Southern knew or should have known about the potentially harmful levels of silica existing at the Sevier Yard and about the potential exposure of its employees to the silica during Eastridge's course of employment.  Plaintiff has presented evidence indicating that dust and sand existed at the Sevier Yard and that Norfolk Southern employees were exposed to this dust and sand from the dust clouds coming from the dust collector and from the sand that came into the locomotives when used to create traction. Plaintiff has also presented substantial evidence by way of employee complaints, Norfolk Southern documents, and railroad investigators' reports, showing that Norfolk Southern knew or should have known of the existence of this dust

and sand.  *See Wooden v. Missouri Pac. R. Co.,*  862 F.2d 560, 561-63 (5th

Cir. 1989)(holding that evidence from the plaintiff, from an industrial

hygienist, and from a treating physician about the existence of dust and

sand created a question of fact as to whether the railroad employer knew

or should have known of the risk to plaintiff).  For example, John Phillip

Barker, a Norfolk Southern employee, testified that in the mid to late 1980s

he turned in numerous complaints about the sand at the Sevier Yard.  He

described how sand would form a cloud completely over the Yard and how

the employees would have to breathe it in during the course of their work.

(Barker Dep. at 13.)  *See Young v. Clinchfield R.R. Co.*, 288 F.2d 499 (4th

Cir.1961)(where plaintiff complained about dust on the job, there was

evidence that the railroad was on notice of the hazards of the job). Also,

Plaintiff testified that Doug Williams, a switchman conductor, filed a

grievance about the way the tanks were filled with sand and dust would

blow out from the vacuum cleaner.  (Eastridge Dep. 9/13/2005 at 125.)

    In addition, Norfolk Southern's internal documents indicate that the

company knew of the existence of silica and knew of its potential harm.  In

a Southern Railway Company[27] document dated December of 1979, the company described a project regarding the dust collector in the John Sevier Yard.  (Doc. 67 Ex. 1; Bates-stamped NSRC-001504.)  The project was to provide and install a bag type dust collection system because "[p]resently sand is being expelled into the atmosphere.  This produces a mess which . . . creates a hazard to the health and safety of personnel working in the area from inhalation of dust and flying particles of sand."  (Doc. 67 Exs. 1 & 2; Bates-stamped NSRC-001054 & NSRC-001055.)  Also, in a 1988 document, Southern Railway Company described a project in which the company was planning to replace the dust collector with a collector that would handle the existing volume of discharge air in order to "eliminate potential injury to employees due to the possibility of . . . respiratory irritation."  (Doc. 67 Ex. 3; Bates-stamped NSRC-004308.)  In a Norfolk Southern letter dated May 9, 1991, one employee writes to R.W. Hart in regard to the dust collector that a state inspector returned to Norfolk Southern to investigate employee complaints regarding dust for the second

---

[27]Norfolk Southern Railway Company previously operated as Southern Railway Company. (Eastridge Dep. 9/13/2005 at 25.)

time.  (Doc. 67 Ex. 4; Bates-stamped NSRC-004307.)  The letter went on to say that the dust collector project—the one referenced in the 1988 document—needed to be completed as soon as possible in order to avoid citation by air quality inspectors.  (Doc. 67 Ex. 4; Bates-stamped NSRC-004307.)  In 1994, a Norfolk Southern employee, M. Haesler, sent an e-mail to R.W. Hart asking about the status of the dust collector upgrade at the Sevier Yard due to the complaints of the crews about "sand blowing all over" their vehicles.  (Doc. 67 Ex. 5; Bates-stamped NSRC-004658.)

Further, testimony of Tennessee state railroad inspectors supports the notion that Norfolk Southern knew of the sand / dust, yet failed to timely remedy the situation.  In August of 1995, Thomas E. Rowe, a state railroad inspector for the Tennessee Public Service Commission,[28] visited Norfolk Southern due to a written complaint from the United Transportation Union regarding sand and dust blowing from Norfolk Southern's dust collector.  (Doc. 67 Ex. 7; Bates-stamped NSRC-004659.)  Rowe visited the rail yard "again" on October 2, 1995 due to complaints regarding dust from the sand

---

[28]The Railroad Safety division of the Tennessee Public Service Commission was transferred to TDOT in 1996.  (Rowe Dep. at 13.)

system.   (Doc. 67 Ex. 6.)   In response to this visit, a Norfolk Southern employee stated that "[i]n order to avoid further action by state, this must be speedily corrected."  *Id.*  In December 1996, Rowe went back to inspect the Sevier Yard because of complaints that the workers were being "exposed to heavy amounts of dust," which was blowing from the dust collector, and that "this [exposure was] hazardous to the health of these employees to have to breathe this dust."  (Rowe Dep.; Rowe Dep. Ex. 1.)   Also, Wayne Pugh, director of the Railroad Safety Division, testified that when he went out and inspected the rail yard, "small particles of sand" were "flying through the air."   (Pugh Dep. at 29-31.)   Pugh testified that he told the supervisors at the Sevier Yard that they would have to get this situation under control or "shut the thing down."  *Id.* at 33.

Based on the complaints of its employees, the company's internal documents, and the investigator's reports, there is evidence that Norfolk Southern knew that silica, or sand, existed and knew about the potential exposure to such dust, yet did not take adequate precautions to protect its employees from harm.  For example, the evidence establishes that while Defendant knew of the sand, it delayed undertaking remedial measures to

eliminate these clouds of dust.  The Railroad Safety Director testified that he went out to inspect the Sevier Yard because the inspector, Rowe, was having some problems getting the sand filters repaired in order to minimize or eliminate the dust.  (Pugh Dep. at 28-29.)  In addition, both the internal documents of Norfolk Southern and the railroad investigator's reports indicate that the railroad was having problems getting the dust collector repaired in a timely fashion and getting the dust situation handled as to prevent potential harm to its employees.  (Doc. 67 Ex. 5; Pugh Dep. at 28-29.)  Therefore, there is evidence creating a genuine issue of material fact as to whether  Norfolk Southern breached its duty to provide Eastridge with a safe working environment by allowing the sand and dust to continue to exist at the Sevier Yard and by failing to take adequate measures to protect its employees.  *See Gallick v. Baltimore & Ohio R.R.*, 372 U.S. 108, 109 (1963)(where employer breached its duty to provide the employee with a safe place to work by allowing a stagnant pool of water to accumulate and attract insects).

      3.     Proximate Cause.

      Defendant contends Plaintiff cannot establish that Norfolk Southern's

alleged negligence proximately caused Plaintiff's injuries.[29]   (Doc. 58.)

Defendant argues that since the only objective air monitoring which has

been done demonstrates that Eastridge would not have been exposed to

harmful levels of respirable asbestos or respirable silica, Plaintiff cannot

establish the first requirement for diagnosis of either asbestosis or

silicosis—a harmful exposure for a sufficient period to develop the disease.

*Id.*

In accordance with the liberal construction of FELA, the United States

Supreme Court has held that "a relaxed standard of causation applies under

FELA."[30]   *Gottshall,* 512 U.S. at 543; *see also Nivens v. St. Louis S.W. Ry.*

---

[29]With regard to causation, Defendant alleges that Plaintiff suffers from UIP and not
asbestosis or silicosis.  (Doc. 58 at 18.)  Plaintiff concedes that if he suffers from UIP,
there is no FELA-based liability.  (Doc. 65 at 19.)  However, Plaintiff "insists that he has
contracted silicosis and proffers the differential diagnosis of Dr. Guidotti."  *Id.*

[30]Defendant argues that a common law conception of "proximate cause" applies, and
that *Rogers* did not address, much less alter, the law governing the degree of causation
necessary.  (Doc. 58 at 29-30.)  In support of its argument, Defendant points to a
concurring opinion in *Norfolk Southern Ry. Co. v. Sorrell*, where the concurring justices
stated that *Rogers* "merely instructed courts how to proceed when there are multiple
cognizable causes of injury."  127 S.Ct. at 809 (Souter, J., concurring). However, in
*Consolidated Rail Corporation v. Gottshall,* the Supreme Court acknowledged the
relaxed standard of causation which applies under FELA.  *See* 512 U.S. at 543;  *Sorrell,*
127 S.Ct. at 812 (Ginsburg, J., concurring).  The Supreme Court refused to address the
question of the proper standard of causation for railroad negligence under FELA in
*Sorrell*; therefore, the Supreme Court precedent regarding causation remains that the
causation standard under FELA is a more relaxed standard.

*Co.*, 425 F.2d 114, 118-21 (5th Cir. 1970)(recognizing the relaxed standard of causation under FELA).   Under FELA, "the test of a jury case is simply whether the proofs justify with reason the conclusion that the employer's negligence played any part, even the slightest, in producing the injury or death for which damages are sought."[31] *Rogers v. Missouri Pac. R. Co.*, 352 U.S. 500, 506 (1957).

Despite FELA's relaxed standard of proximate cause, a plaintiff still bears the burden of presenting evidence from which a jury could conclude a "probable" or "likely" causal connection between a defendant's negligence and the plaintiff's injuries as opposed to merely a "possible" one. *See Edmonds v. Illinois Cent. Gulf R.R. Co.*, 910 F.2d 1284, 1288 (5th Cir. 1990); *Mayhew v. Bell S.S. Co.*, 917 F.2d 961, 964 (6th Cir. 1990).  The causal link between an event sued upon and the plaintiff's injuries must be shown by competent evidence.  *See Green v. Reynolds Metals Co.*, 328 F.2d 372 (5th Cir. 1964); *Pan-American Cas. Co. v. Reed*, 240 F.2d 336 (5th Cir. 1957).  "The burden of the employee is met, and the obligation of the

---

[31]Under FELA, the jury should determine liability as long as the evidence justifies "with reason, the conclusion that the employer played any part" in producing the injury. *Rogers*, 352 U.S. at 507.

employer to pay damages arises, when there is proof, even though entirely circumstantial, from which the jury may with reason" make the causal connection. *Rogers*, 352 U.S. at 508. The existence of a causal connection between exposure to a certain toxin and injury or disease requires specialized expert knowledge and testimony. *See Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 670 (5th Cir. 1999)(stating that "scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities" are necessary to prove causation in a toxic tort case). Therefore, in this case subjudice, expert testimony is required to enable the trier of fact to determine whether the exposure caused the disease.

In FELA cases, where several explanations are plausible, the  issue of causation is better left to the jury.[32]  *See Gallick*, 372 U.S. at 114-16 (where there was a question of whether any employer negligence caused the harm

_____

[32]According to the Supreme Court:

> It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences.  The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury.

*Tennant v. Peoria & P.U.R. Co.*, 321 U.S. 29, 35 (1944).

or whether plaintiff's injury resulted elsewhere, court held that there was enough evidence to go to a jury); *Schulz v. Pa. R. Co.*, 350 U.S. 523 (1956)(where a fireman drowned due to undetermined circumstances arising from work in dark, icy conditions, the court held that since there was some evidence of negligence and some evidence of an accidental death, the evidence of causation required submission of the case to a jury); *Lavendar v. Kurn*, 327 U.S. 645 (1946)(where it was uncertain which of various alternative explanations caused the injury—plaintiff alleged that a hook protruded from the train and hit the victim while defendant argued it was an unknown murderer—court held that the issue should be submitted to the jury).

Here, the record contains evidence that Eastridge's injuries could have been caused by the negligence of Norfolk Southern.  Plaintiff has presented evidence that he was exposed to dust and sand while working at the Sevier Yard and has proffered expert testimony that this type of exposure to silica could have caused Plaintiff's silicosis.  *See Young*, 288 F.2d 499 (where plaintiff presented evidence that he was exposed to heavy dust while performing his work and evidence from a physician who stated that this type

of exposure could have caused plaintiff's silicosis, court held that plaintiff presented sufficient evidence to create a jury issue).

There is ample testimony that dust and sand existed at the Sevier Yard, and that Plaintiff was exposed to such during his employment with Norfolk Southern.  Eastridge testified that he was exposed to asbestos and sand on the railroad through the cab ceiling of the locomotives, the traction sand used in doing the hump job, the sand used when pulling out on the road in order to get up hills, the sand and dust used to fill the locomotives, and the sand and dust that escaped from the dust collector.  (Eastridge Dep. 9/13/2005 at 95-103.)  For example, Plaintiff testified that he was exposed to silica when he used sand to create traction in order to operate the locomotives.  *Id*. at 96.  Eastridge testified that he knew that the sand was getting into the cab because he "could actually see it" in the cab.  *Id*.  He stated that the sand got into the cab through holes in the floorboard and through the windows.  *Id*.  Also, Plaintiff testified that silica would blow out when sand was used to fill the locomotives.  *Id*. at 101-02.  Plaintiff further testified that sand and dust that existed in the yard and that he was thereby exposed to it due to the dust that escaped from the dust collector.

(Eastridge Dep. 9/14/2005 at 115, 130.)  In addition, Wayne Robert Kirkland,

an employee of Norfolk Southern, testified that he knew about Eastridge's

exposure due to his own exposure to sand at the Sevier Yard and from his

common experience of working on the railroad.   (Kirkland Dep. at 39.)

Kirkland testified that the railroad ran on sand, and that the sand blew back

into the locomotive through the open doors and windows. *Id*. at 39-40, 49.

Kirkland also testified that Eastridge was exposed to sand when he sanded

his own engine.  *Id*. at 42.  Further, Kirkland testified that a cloud of sand

would hang in the air at the Sevier Yard for hours.  *Id*. at 66.  Even Mark

Dudle, an industrial hygienist for Norfolk Southern, found the existence of

respirable silica at the Sevier Yard.  (Dudle Dep. Pla. Ex. 3.)   In conducting

exposure monitoring for respirable silica in July 1998, Dudle's report found

the existence of respirable silica, even though it was only a small amount.

*Id*.

Defendant contends that Plaintiff cannot establish that he was actually

exposed to silica and therefore is unable to prove causation.  (Doc. 58.)

Defendant relies on the contention that neither Plaintiff nor his experts can

establish that Eastridge was ever harmfully exposed.  *Id*.

In "toxic tort cases, [s]cientific knowledge of the harmful levels of exposure to a chemical plus knowledge that plaintiff was exposed to such quantities are minimal facts necessary to sustain the plaintiff's burden. . . ." *McClain*, 401 F.3d at 1241. However, "[i]n most toxic tort cases it is impossible as a matter of practice to quantify with hard proof-such as the presence of the alleged toxic substance in the plaintiff's blood or tissue-the precise amount of the toxic substance to which an individual plaintiff was exposed." *Plourde v. Gladstone,* 190 F. Supp. 2d 708, 721(D. Vt. 2002)(citations omitted); *see also* REFERENCE MANUAL ON SCI. EVID. 439. In toxic tort cases, it has been recognized that "[o]nly rarely are humans exposed to chemicals in a manner that permits a quantitative determination. . . . Human exposure occurs most frequently in occupational settings where workers are exposed to industrial chemicals . . .; however, even under these circumstances, it is usually difficult, if not impossible, to quantify the amount of exposure." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 264 (4th Cir.1999)(citing REFERENCE MANUAL ON SCI. EVID. 187 (Federal Judiciary Center, 1994)). Therefore, expert testimony regarding toxic issues can be used to establish exposure levels through reliable circumstantial evidence.

*Plourde,* 190 F. Supp. 2d at 721; *see also Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 157 (3d Cir. 1999)(noting "that even absent hard evidence of the level of exposure to the chemical in question, a medical expert could offer an opinion that the chemical caused plaintiff's illness").

Where evidence of the precise level of toxic exposure is limited, "courts have looked favorably on causation testimony that is primarily based on differential diagnosis. . . ."[33]  *Plourde,* 190 F. Supp. 2d at 722 (citing *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043-44(2d Cir. 1995); *Kannankeril*, 128 F.3d at 808; *Westberry*, 178 F.3d at 262); *see also CSX Transp., Inc.*, 858 A.2d at 1074 (stating that differential diagnosis is an appropriate method for making a determination of causation).  Yet, courts are "reluctant to admit causation testimony based on differential diagnosis where the proffered expert possesses only weak circumstantial evidence that some exposure occurred."  *Id.*

---

[33]A medical expert can testify that there was more than one potential cause of a plaintiff's condition.  *See Sentilles v. Inter-Caribbean Shipping  Corp.*, 361 U.S. 107 (1959)(where a seaman sought damages for a tubercular disease that he claimed was caused by an accident that activated a latent tubular condition and none of the medical witnesses testified that the accident in fact caused the illness, the court concluded that the testimony did not impair a jury's ability to draw causal inferences despite the lack of medical certainty).

In this case, Dr. Guidotti used differential diagnosis to form his opinion as to the cause of Plaintiff's injury.  In performing differential diagnosis, Dr. Guidotti relied on the Plaintiff's history, the clinical records, testimony from other physicians, and various other materials.  In forming an opinion as to the cause of Plaintiff's injuries, reliance on a patient's statements to render a medical opinion is justified as long as the physician takes into account other factors such as the patient's medical history, the findings of other physicians, and clinical features.  *See In re Agent Orange Product Liab.*, 611 F. Supp. 1223, 1240-46(E.D.N.Y. 1985); *see also In re Silica Products Liab. Litig.*,  398 F. Supp. 2d at 590.  As discussed above,[34] Dr. Guidotti's opinion based on differential diagnosis is admissible.  Therefore, Dr. Guidotti's testimony that Plaintiff suffers from silicosis, which is based on differential diagnosis, provides sufficient evidence that Plaintiff's injuries were caused by Norfolk Southern's alleged negligence.  *See Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 265 (6th Cir. 2001)(holding that a physician's differential diagnosis was sufficient to establish causation, and that neither an epidemiological study nor a study conducted on the precise type of

---

[34]*See* Section III(D), *supra*.

employee involved in the suit was necessary in order to establish causation).

Next, Defendant contends that since the air monitoring does not establish that a person doing the work of a locomotive engineer would have been exposed to harmful levels of silica or asbestos, Plaintiff cannot establish a harmful exposure.  (Doc. 58.)  However, "it makes little sense to require a plaintiff to establish a dose/response relationship or threshold level in a situation where there has been no scientific study conducted." *Hardyman*, 243 F.3d at 265.  Here, Norfolk Southern did not engage in air monitoring or silica exposure testing until 1998.  Therefore, if this Court were to require Plaintiff to rely on scientific testing of Plaintiff's exposure, the "requirement essentially would foreclose plaintiff[] from recovering." *Hardyman*, 243 F.3d at 265.

Under the broad standard for causation in FELA cases, it appears that Plaintiff has presented evidence indicating a genuine issue of material fact as to whether Norfolk Southern's negligence, if any, played a part in causing Eastridge's injury.

Based on the foregoing, Defendant's motion for summary judgment is due to be denied.

V.     Motion to Transfer.

Defendant submits to the Court that this case should be transferred to the United States District Court for the Eastern District of Tennessee, Northern Division, pursuant to 28 U.S.C. § 1404(a) ("§ 1404(a)") for the convenience of the witnesses and parties, and in the interest of justice. (Doc. 63.)

Section 1404(a) governs the transfer of civil actions from one district court to another: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."[35]   28 U.S.C. § 1404(a)(2006).  The purpose of § 1404(a) is "to prevent avoidable waste of time, energy and money, and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Lemke v. St. Margaret Hosp.*, 594 F. Supp. 25, 27 (N.D. Ill. 1983).

"The decision to transfer a case to another district is left to the sound discretion of the trial court." *Brown v. Conn. Gen. Life Ins. Co.*, 934 F.2d

---

[35]Actions brought under FELA are within the scope of 28 U.S.C. § 1404(a).  *See Ex parte Collett*, 337 U.S. 55, 59-61 (1949).

1196, 1197 (11th Cir. 1991) (quoting *Howell v. Tanner*, 650 F.2d 610, 616 (5th Cir. 1981), *cert. denied*, 456 U.S. 918 (1982)).  Section 1404(a) places discretion in the district court to adjudicate motions for transfer on an "individualized, case-by case consideration of convenience and fairness." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988).  "Generally, 'when the plaintiff's chosen venue is proper, the defendant has the burden of demonstrating that the action should be transferred in the interests of convenience and justice.'" *Folkes v. Haley,* 64 F. Supp. 2d 1152, 1154 (M.D. Ala. 1999)(citing *Sizemore v. Able Body Temp. Serv.*, 981 F. Supp. 1451, 1453 (M.D. Ala.1997)(citing *In re Ricoh Corp.*, 870 F.2d 570, 573 (11th Cir.1989)).

A court's analysis of a § 1404(a) motion to transfer involves a two-step inquiry.   "First, the court must determine whether the actions could 'originally have been brought in the proposed transferee district court;' then, the court must determine whether the action should be transferred 'for the convenience of the parties [and] in the interest of justice.'" *C.M.B. Foods, Inc. v. Corral of Middle Ga.*, 396 F. Supp. 2d 1283, 1286 (M.D. Ala. 2005) (quoting *Folkes*, 64 F. Supp. 2d at 1155) (internal citations omitted).

Therefore, the threshold question is whether Plaintiff could have initiated this action in the United States District Court for the Eastern District of Tennessee, and there does not appear to be any question that Plaintiff could have brought this suit against Norfolk Southern in that court.  Because FELA is the basis for the Court's subject matter jurisdiction in this case, Plaintiffs could have filed their lawsuit in any federal court of competent jurisdiction. For a civil action where jurisdiction is based on a federal question, the claim may be brought in "a judicial district where the defendant resides;" "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred;" or "a judicial district in which any defendant may be found." 28 U.S.C. § 1391(b)(2006).  In addition, under FELA, "an action may be brought in a district court of the United States, in the district of the residence of the defendant, or in which the cause of action arose, or in which the defendant shall be doing business at the time of commencing such action." 45 U.S.C. § 56 (2007)(FELA is a special venue statute).  Since Eastridge lives and worked in Knoxville, Tennessee, and since Plaintiff's allegation that his silicosis resulted from his exposure to sand while working arise from events or omissions that occurred in Knoxville, Tennessee, this

case could have been brought in the Eastern District of Tennessee, Northern Division.  *See* 28 U.S.C. § 1391(b)(2)(a claim may be brought in the judicial district where a substantial part of the events occurred); *see also* 45 U.S.C. § 56.  In addition, since Norfolk Southern conducted its business in the Eastern District of Tennessee at the time of the commencement of this suit, the case could have been brought there.  *See*  45 U.S.C. § 56.

After determining that the case could have been brought in the United States District Court for the Eastern District of Tennessee, this Court "must determine whether the interests of justice would be served by a transfer of venue." *First Fed. Savings & Loan v. Berger*, 672 F. Supp. 1454, 1456-57 (M.D. Ga. 1987) (citing *Dove v. Mass. Mutual Life Ins. Co.*, 509 F. Supp. 248, 250 (S.D. Ga. 1981)).  In making this determination, courts consider various factors, including the following: the plaintiff's choice of forum; the convenience of the parties; the convenience of the witnesses; the availability of witnesses through compulsory process; location of counsel; local interest in adjudicating local disputes; the relative ease of access to sources of proof, and the location of documents and other sources of proof; the relationship of the subject matter of the lawsuit to the forum, and the

location of the alleged wrong; the relative ability of the parties to bear the expense of changing the forum; and trial efficiency and expense to the justice system.  *See Nolte v. BellSouth Telecomms., Inc.,* 2007 WL 2253561, at * 2-3 (N.D. Ala. June 29, 2007); *Vizionworks, LLC v. Ellenburg,* 2007 WL 1100512, at *2 (M.D. Ala. Apr. 12, 2007); *Young v. Candian Nat'l Ry.,* 2003 WL 133220, at * 2-3 (E.D. La. Jan. 15, 2003); *Gould v. Nat'l Life Ins. Co.*, 990 F. Supp. 1354, 1357 (M.D. Ala. 1998).  However, it is the burden of the moving party to demonstrate that the "balance of the 1404(a) interests favors transfer." *First Fed. Savings*, 672 F. Supp. at 1457; *see also Martin v. S.C. Bank*, 811 F. Supp. 679, 683 (M.D. Ga. 1992).

A.    Plaintiff's Choice of Forum.

While the plaintiff's choice of forum is a factor considered by courts in determining whether to transfer a case, it is neither conclusive nor determinative.  *See Garner v. Wolfinbarger*, 433 F.2d 117, 119 (5th Cir. 1970).  Federal courts "will accord great deference to the plaintiff's choice of forum if the forum is in the district in which he or she resides." *Nolte*, 2007 WL 2253561, at *2 (citing *In re Ricoh Corp.*, 870 F.2d at 573).  However, if a plaintiff does not reside in the chosen forum, he is not

provided such deference and the plaintiff's choice will be closely scrutinized.  *See Nolte*, 2007 WL 2253561, at *2; *Shoemake v. Union Pac. R.R.*, 233 F. Supp. 2d 828, 831 (E.D. Tex. 2002).  In addition, "[w]here the plaintiff's chosen forum has no factual nexus to the case, that choice carries little significance if other factors weigh in favor of transfer."  *Shoemake*, 233 F. Supp. 2d at 830 (citations omitted); *see also Bailey v. Union Pac. R. Co.*, 364 F. Supp. 2d 1227, 1230 (D. Colo. 2005)(where plaintiff's choice of forum was neither his home nor the place of the accident, it was entitled to little weight).

Here, Eastridge lives in Knoxville, Tennessee and has lived there all of his life, except for two years while he was in the Navy and three years in Illinois.  (Doc. 62; Eastridge Dep. 9/13/2005 at 130-31; Eastridge Dep. 9/14/2005 at 89-91.)  Plaintiff has never lived or worked in the state of Alabama.  *Id.*  Since Plaintiff does not reside in Alabama, his choice of forum is not provided great deference.  In addition, Defendant does not "reside" in Alabama as Defendant is incorporated in Virginia and is headquartered in Norfolk, Virginia.  *See In re Horseshow Entm't*, 337 F.3d 429, 433 (5th Cir. 2003), *cert. denied,* 540 U.S. 1049 (2003) (the location of a corporation's

principal office is a permissible factor in determining where a corporation resides); *Nolte*, 2007 WL 2253561, at *2 (stating that defendants do not reside in Alabama because they are headquarted in Georgia).  Further, the allegations that give rise to the lawsuit have no connection with the state of Alabama.  Plaintiff's allegation that he developed silicosis due to his exposure to silica during his employment arises from events that occurred at the Sevier Yard in Knoxville, Tennessee.  (Eastridge Dep. 9/13/2005 at 37, 46-50, 105-08 & 130-31.)   Because Plaintiff has no connection to Alabama, Defendant does not reside in Alabama, and the events giving rise to the claim are not connected to Alabama, the forum selected by Plaintiff is not connected with the parties or the subject matter of the lawsuit.  *See Hutchens v. Bill Heard Chevrolet Co.,* 928 F. Supp. 1089, 1091 (M.D. Ala. 1996)("where the forum selected by the plaintiff is not connected with the parties or the subject matter of the lawsuit, it is generally less difficult than otherwise for the defendant, seeking a change of venue, 'to meet the burden of showing sufficient inconvenience to tip the balance of convenience strongly in the defendant's favor'")(citations omitted).

      B.    Convenience of the Parties.

In considering the convenience of the parties, the Court will consider factors such as the location of each party.  With regard to the location of Plaintiff, Eastridge lives in Knoxville, Tennessee, and has lived there for the majority of his life.  (Doc. 62.)  While working for Norfolk Southern, Plaintiff worked in and around Knoxville.  *Id.*  Plaintiff has never lived or worked in Alabama. (Eastridge Dep. 9/13/2005 at 37 & 130-31.)  While Plaintiff may have waived any inconvenience by filing the matter in  this Court, the fact remains that the federal courthouse in Knoxville is approximately 307 miles closer to Eastridge's home than the Tuscaloosa courthouse.[36]

Norfolk Southern is a Virginia corporation with headquarters in Norfolk, Virginia.  However, Defendant also operates in both Alabama and Tennessee.  The Alabama division offices for Norfolk Southern are located in Irondale, Alabama, which is within the Southern Division of the Northern District of Alabama.  (Doc. 30.)  Defendant has railroad tracks which run primarily through the Southern Division, but also has a track which runs through the Western Division.  *Id.*  In addition, as evidenced by Plaintiff's

---

[36]The federal courthouse in Knoxville is 5.5 miles from Plaintiff's residence, and the courthouse in Tuscaloosa is 312.4 miles away.  (Doc. 63 Exs. G & H.)

employment with Norfolk Southern, Defendant operates in Knoxville, Tennessee.  Under the FELA special venue statute, Norfolk Southern is subject to either forum in terms of its own location since it does business in both the Western Division of the Northern District of Alabama and the Northern Division of the Eastern District of Tennessee.

While Defendant is subject to either forum, Defendant argues that the Eastern District of Tennessee would be more convenient as it would create less of a burden on Norfolk Southern's operations.  (Doc. 63.)  Since Plaintiff performed his work in Knoxville, any of Plaintiff's co-workers who would be called to testify would most likely be from the Knoxville, Tennessee area.  (Driskell Aff. at ¶ 4.)  All of Eastridge's co-workers who are still employed by Defendant live and work in the Knoxville area.  *Id.*  If any of such present Norfolk Southern employees were called to testify, it would be more convenient for Norfolk Southern for the case to be tried in Tennessee since this would mean less lost work time and less burden on its operations.  *Id.*  If the case is tried in Tuscaloosa, any Norfolk Southern employee who is called to testify will likely miss at least three days of work since the employee would have to drive 320 miles to testify.  (Ford Aff. at ¶ 4.)  On

the other hand, if the case is tried in Knoxville, the employees would likely only miss one day of work. *Id.* With the lost work of its employees, Norfolk Southern would have to get other employees to work overtime to cover the shifts and would in turn suffer a significant expense and burden. *Id.* Therefore, while Norfolk Southern is subject to the current forum since it has operations in Alabama, the requested transfer may lessen Norfolk Southern's inconvenience. *See LaSalle Bank N.A. v. Mobile Hotel Properties, LLC,* 274 F. Supp. 2d 1293, 1301-02 (S.D. Ala. 2003)(where defendant and all of its potential witnesses resided in Louisiana, court stated that it was more convenient for defendant to transfer the case to Louisiana); *Robertson v. Kiamichi R. Co., L.L.*, 42 F. Supp. 2d 651, 657 (E.D. Tex. 1999)(where plaintiff and defendant both resided in Hugo, Oklahoma, which was closer to the Paris Division courthouse, the court held that the residence of the parties slightly favored a transfer to the Paris division); *Insuracorp., Inc. v. Am. Fid. Assur. Co.*, 914 F. Supp. 504 (M.D. Ala. 1996)(where a defendant sought to transfer a case to its district where its records were located, court held that convenience of parties weighed in favor of transfer); *but see Shoemake*, 233 F. Supp. 2d at 832 (where

defendant was headquartered in Nebraska, and conducted business in both the Eastern District of Texas and the Western District of Louisiana, the convenience of the parties factor was unaffected by defendant's location). Thus, this factor weighs slightly in favor of transfer.

      C.    Convenience of the Witnesses.

In determining whether to transfer a case under § 1404(a), "[t]he most important factor . . . is the convenience of the witnesses." *Owens v. Blue Tee Corp.*, 177 F.R.D. 673, 679 (M.D. Ala. 1998)(quoting *Insuracorp, Inc.*, 914 F. Supp. at 506); *see also Merritt v. Jay Pontiac-GMC Truck, Inc.*, 952 F. Supp. 754, 756 (M.D. Ala.1996); *Hutchens*, 928 F. Supp. at 1091. "In terms of witnesses, venue is considered convenient in the district or division where the majority of witnesses are located." *Shoemake*, 233 F. Supp. 2d at 832; *see also Owens*, 177 F.R.D. at 679 (quoting *Insuracorp, Inc.*, 914 F. Supp. at 506. In addition, the "convenience of nonparty witnesses is accorded greater weight than that of party witnesses." *Shoemake*, 233 F. Supp. 2d at 832.

Here, the convenience of the majority of the witnesses favors a trial in Knoxville. For example, Plaintiff's co-workers live in or around Knoxville,

Tennessee.  (Driskell Aff.; Ford Aff.)  To the extent that any of Plaintiff's co-workers are called to testify, a trial in Knoxville would be more convenient in terms of both distance and missed work.  In terms of distance, Plaintiff's co-workers, previous and current employees of Norfolk Southern, are from the Knoxville, Tennessee area, which is approximately 320 miles away from Tuscaloosa.[37]  (Driskell Aff.)  Also, any co-workers who are currently employed by Norfolk Southern would be required to miss more days of work since the employee would likely spend one day traveling to Tuscaloosa, one day testifying, and one day returning home, as opposed to missing work only for the day of testifying in Knoxville.  (Driskell Aff.; Ford Aff.)  In addition to Plaintiff's co-workers, Plaintiff's senior supervisor since 1987, Steven B. Driskell, lives in Andersonville, Tennessee, about fifteen to twenty miles from Knoxville, and works out of Knoxville, Tennessee. (Driskell Aff.; Eastridge Dep. 9/13/2005 at 147.)  Driskell testified that "Knoxville would be a significantly more convenient location for me than Tuscaloosa, Alabama to participate in a trial."  *Id.*  Further, the Norfolk

_____

[37]This distance is measured from the Sevier Yard in Knoxville to the federal courthouse in Tuscaloosa.  (Doc. 63.)

Southern employees who operate, maintain, and have knowledge about the dust collector work at the Sevier Yard in Knoxville live in or around the Knoxville area.  (Ford Aff.)  Since Plaintiff's injury was allegedly caused by the dust at the Sevier Yard, these employees may be called to testify regarding the operation of the sand system, the fueling of locomotives, the dust collector, and the existence of sand at the Sevier Yard.  (Ford Aff.) Additionally, Defendant has pointed out that all of Plaintiff's doctors' offices, including his treating physician Dr. Schriver, are located in Knoxville.   (Doc. 63.)   Therefore, Defendant has established that the majority of the fact witnesses reside in Knoxville, Tennessee, especially since the alleged injury took place there, indicating that it would be more convenient for the witnesses to transfer the case.  *See Folkes*,  64 F. Supp. 2d at 1155 (stating that the "residence of the majority of material principal witnesses is an important factor to consider"); *Robertson*, 42 F. Supp. 2d at 657.

Plaintiff counters with arguments that it is unlikely that Plaintiff's physicians and co-workers will be called as live witnesses and that Defendant fails to take into account the convenience of the expert

witnesses. (Docs. 28 & 68.) First, Plaintiff argues that it is "unlikely that William Eastridge's treating physicians will be called as 'live' witnesses." (Doc. 28.) However, since the witnesses have not been disclosed, no evidence presented to this Court indicates whether the treating physicians will actually be called to testify. Next, Plaintiff contends that Norfolk Southern has not specified any co-workers who will be live trial witnesses, other than the implication that Driskell would be called to testify, and that Norfolk Southern presented no evidence that the witnesses would be inconvenienced. (Doc. 28.) However, pursuant to Federal Rule of Civil Procedure 26(a)(3), Defendant is not required to disclose witnesses who will testify at trial until thirty days prior to trial. Fed. R. Civ. Pro. 26(a)(3). Therefore, while Defendant has not disclosed the specific identity of the co-workers who will be called to testify, Defendant does indicate that it will call co-workers, Driskell, and Norfolk Southern employees with knowledge of the operations of the dust collector; and that such witnesses will be inconvenienced by a trial in Tuscaloosa. Also, Defendant established that Plaintiff's co-workers would be inconvenienced since they would have to travel over 300 miles to testify and because they would have to miss more

days of work than if the trial was held in Knoxville.  Further, Plaintiff argues

that Norfolk Southern does not take into consideration the convenience of

the retained experts.  (Doc. 68.)  Dr. Guidotti and Dr. Goldsmith, both work

in Washington DC, so Knoxville would arguably be just as inconvenient as

Tuscaloosa.  *Id.*  Dr. Goldstein, a consulting expert, practices in Birmingham,

Alabama, so Tuscaloosa would likely be more convenient than a court in

Knoxville.  *Id.*  However, as Plaintiff himself stated (Doc. 28),[38] since these

witnesses are being retained as expert witnesses, they are being

compensated for their testimony and would be expected to travel to any

forum in which the trial is held.  Therefore, the inconvenience of the

retained experts is not enough to justify denying a transfer, especially since

the majority of witnesses live in Knoxville, Tennessee.  *See Young v.*

*Canadian Nat'l Ry. Co.*, 2003 WL 133220, at *3 (E.D. La. Jan. 15,

2003)(stating that the fact that the only witness who would be convenienced

by keeping the case in the chosen forum would be the retained expert was

not enough to justify a transfer); *Bailey v. Union Pac. R. Co.*, 364 F. Supp.

---

[38]Plaintiff states that Dr. Schriver has been designated as an expert witness; therefore, since she will be paid for her testimony, she would be expected to travel to any forum. (Doc. 28.)

2d 1227, 1232 (D. Colo. 2005)(while the location of an expert is a factor to be considered, it is far from controlling especially when the majority of the witnesses reside in Nebraska, the forum to which the court transferred the case).

Defendant has established that the majority of the material principal witnesses are likely to be located in the Eastern District of Tennessee, establishing that it would be more convenient for the witnesses to try to the case in Knoxville.   Therefore, the Court finds that in the interests of convenience of the witnesses, the Defendant has carried its burden of proving that this factor weighs in favor of transfer.

D.   The cost of obtaining the attendance of witnesses and the availability of compulsory process for witnesses.

The availability of compulsory process to bring unwilling witnesses to trial and the costs associated with bringing witnesses to trial are important factors to be considered when determining whether to transfer the case. *See TV-3, Inc. v. Royal Ins. Co. of Am.*, 28 F. Supp. 2d 407, 412 (E.D. Tex. 2002).

Here, the majority of the potential witnesses will be subject to

compulsory process if trial is held in Knoxville; however, many of these witnesses will not be subject to compulsory process in Tuscaloosa. *See* Fed. R. Civ. Pro. 45(b)(2)(stating that "a subpoena may be served at any place within the district of the court by which it is issued, or at any place without the district that is within 100 miles of the place of the . . . trial"). For example, many of the Norfolk Southern employees who may have information about the operations at the Sevier Yard and about the dust collector system have retired from the company but still live in the Knoxville area. (Doc. 63.) While these fact witnesses could be served with a subpoena and ordered to testify in Knoxville, they would not be subject to such processes if the trial was held in Tuscaloosa since the courthouse is over 300 miles away. *See Young v. Canadian Nat'l Ry. Co.*, 2003 WL 133220, at *3 (stating that the fact that the eyewitness co-worker was within the subpoena power of the Alabama court weighed in favor of transfer). In addition, it would cost less to hold the trial in Knoxville than in Tuscaloosa because a trial in Tuscaloosa would require the witnesses to travel to Tuscaloosa, over 300 miles away, and these witnesses would be expected to be reimbursed for travel expenses and lost wages. In contrast, if the trial

was held in Knoxville, the witnesses would likely only travel 15-20 miles and would miss less work.  The travel costs incurred by such witnesses having to testify in Tuscaloosa would substantially increase the costs of litigation.  Therefore, based on the potential inability to subpoena Tennessee residents to Tuscaloosa and the increase in costs of obtaining witnesses, this factor weighs in favor of transfer.

      E.      Relationship of Subject Matter to Forum.

"Where none of the conduct complained of took place in the forum selected by Plaintiff, the Plaintiff's choice of forum is of minimal value in determining whether to transfer an action." *Johnston v. Foster-Wheeler Constructors*, 158 F.R.D. 496, 505 (MD. Ala. 1994); *see also Shoemake*, 233 F. Supp. 2d at 830 ("Where the plaintiff's chosen forum has no factual nexus to the case, that choice carries little significance.").

Here, it is undisputed that the events or omissions giving rise to this alleged injury occurred in Knoxville, Tennessee.  Therefore, the alleged wrong occurred in Knoxville, which is in the Eastern District of Tennessee.  In addition, this case has absolutely no connection to Alabama except that the Plaintiff filed the case here.  Since none of the complained of conduct

took place in Alabama and since Plaintiff does not reside in Alabama, the Plaintiff's choice of forum is entitled to little deference.  Thus, this factor weighs in favor of transfer to the Eastern District of Tennessee.  *See Young v. Canadian Nat'l Ry. Co.*, 2003 WL 133220, at *3 (E.D. La. Jan. 15, 2003)(where plaintiff was a resident of Mobile, Alabama and the accident occurred near Mobile, the court held that these factors weighed in favor of transferring the case to the Southern District of Alabama)*; Johnston*, 158 F.R.D. at 505; *Shoemake*, 233 F. Supp. 2d at 832.

>    F.    Location of counsel.

Plaintiff argues that the Northern District of Alabama would be a more convenient forum because Plaintiff's counsel resides in Alabama, is licensed to practice in Alabama, and would have to retain local counsel to try the case in Tennessee.

"[T]he convenience of plaintiff's counsel is entitled to little weight when determining whether transfer is appropriate in this case." *Nolte*, 2007 WL 2253561, at *3.  In fact, courts have held that where counsel is located is entitled to the least consideration of the factors.  *Id.*

In this case, Plaintiff resides in the Eastern District of Tennessee,

Northern Division.  When he selected counsel from Birmingham, Alabama, a city far away from the majority of the key fact witnesses located in Knoxville, Plaintiff should have expected to incur expenses arising from his counsel's gathering information from such witnesses.  Also, in choosing counsel from Birmingham to represent him in this case, he should have expected some travel by counsel to the litigation whether the case is tried in Tuscaloosa or Knoxville.  *See Vizionworks, LLC,* 2007 WL 1100512, at *2 (where the plaintiff did not reside in either of possible districts, the court stated that plaintiff understood that he would be incurring additional expenses in bringing litigation in a distant venue; and since plaintiff chose legal counsel in a city outside of the district and far away from witnesses, he should have anticipated expenses for his counsel).

Next, Plaintiff argues that the location of counsel should be given some weight since he selected counsel's home forum.  (Doc. 28.)  *See Barnett v. Kirby Inland Marine, Inc.,* 202 F. Supp. 2d 664, 669 (S.D. Tex. 2002)(stating that this factor should be given some weight "if Plaintiff chooses local counsel to bring the suit").  Plaintiff's counsel's office is located about two blocks from the courthouse where cases in the Southern

Division of the Northern District of Alabama are tried, and approximately 55-60 miles away from the courthouse in Tuscaloosa.  (Doc. 30.)   While some deference will be given to counsel's location since Plaintiff chose local counsel to bring the suit, this factor is entitled to little weight and will not outweigh other factors demonstrating that a transfer is appropriate.  *See See Barnett*, 202 F. Supp. 2d at 669;   *Nolte*, 2007 WL 2253561, at *3.

Further, Plaintiff argues that the Tennessee Bar rules, Local Rule 83.5, regarding *pro hac vice* practice would require Plaintiff to retain the services of a licensed Tennessee attorney to have an active involvement in the prosecution of the case, which would cause Plaintiff to incur addition costs in litigating the claim.  (Doc. 28; Alexander Aff.)

Local Rule 83.5 of the United States District Court for the Eastern District of Tennessee provides:

> [A]ttorneys who are admitted to and  entitled to practice in other district courts of the United States may be permitted to practice specially in this district *pro hac vice* in a particular case provided it is certified by the presiding judge or clerk of the proper court that they are members in good standing of the bar of the United States District Court of their residence and a copy of the certificate is submitted.  Said certificate should be filed with the motion for admission *pro hac vice*. . . .  Attorneys desiring to appear *pro hac vice* shall pay a fee of $60.00 upon

filing of such motion.

E.D. TN. LR 83.5(b)(1)(2007).  According to an Eastern District of Tennessee District Court, "[o]ur Local Rules do not require attorneys requesting admission *pro hac vice* to associate with an attorney previously admitted to practice in Tennessee state courts, and this Tennessee state court procedural requirement is not incorporated into the Local Rules of this Court by virtue of reference to the Rules of the Tennessee Supreme Court in Local Rule 83.5(1)." *Priest v. Global Furniture, Inc.*, 2005 WL 3448051, at *2 (E.D. Tenn. Dec. 15, 2005).  Therefore, in order to appear *pro hac vice*, an attorney, admitted to practice in another United States district court, is only required  to file a motion to appear along with a fee of $60.00 and a certificate of good standing; there is no requirement that such counsel admitted *pro hac vice* retain local counsel.  *See id.*; E.D. TN. LR 83.5(b)(1).  Thus, while Plaintiff will incur expenses in counsel traveling to litigation, he will not bear the costs of having to retain local Tennessee counsel in the event that the case is transferred.  *Compare Bodine's, Inc. v. Sunny-O, Inc.*, 494 F. Supp. 1279, 1286 (N.D. Ill. 1980)(where plaintiff would have to retain local counsel in Florida as well as bear the expense of transportation to and

from Florida for its present counsel if the case was transferred, court held that  this factor suggested that transfer would not be appropriate).

Thus, the location of the counsel, while taken into consideration, will not outweigh the other factors demonstrating that a transfer of this case to to the Eastern District of Tennessee would be more convenient.  *See Nolte*, 2007 WL 2253561, at *3.

G.    Local Interest in Adjudicating.

Since the alleged negligence occurred at the Sevier Yard in Knoxville, Tennessee, and Plaintiff is a resident of Knoxville, Tennessee, the people of the Eastern District of Tennessee have an interest in adjudicating this dispute.  The allegations underlying Plaintiff's claim have nothing to do with the state of Alabama.  While the Defendant does conduct business in both Alabama and Tennessee, the facts that the alleged wrong occurred in the Eastern District of Tennessee and that Plaintiff, along with numerous witnesses, resides there  indicate that the citizens of the Eastern District of Tennessee have a strong local interest in resolving this suit.  *See Shoemake*, 233 F. Supp. 2d at 835 (stating that the facts that the alleged accident occurred in the Western District of Louisiana and that the plaintiff and

several witnesses who saw the accident resided in that district indicated the local interest in resolving the suit).  Thus, this public interest factor favors transfer to the Eastern District of Tennessee.

H.    Jurors.

Since the citizens of the Eastern District of Tennessee have a strong interest in adjudicating this suit, it follows that the jury pool of the Eastern District would be less burdened in deciding this matter.  The events giving rise to Plaintiff's claim occurred in Knoxville, Tennessee, and Plaintiff and witnesses reside there.  Because the Eastern District is the forum with the strongest nexus to this matter, the jurors of that district have a more substantial interest in adjudicating this matter.  *See Robertson,* 42 F. Supp. 2d at 659 (where the court stated that since the operative facts occurred in Oklahoma, citizens of Beaumont should not be burdened with jury duty).  Thus, this factor weighs in favor of a transfer to the Eastern District of Tennessee.

I.    Forum Shopping.

When a plaintiff's chosen forum "amounts to nothing more than forum shopping, which is historically disfavored by federal courts," the deference

typically afforded the plaintiff's choice of forum is lessened.  *A.J. Taft Coal Co. v. Barnhart*, 291 F. Supp. 2d 1290, 1309-10 (N.D. Ala. 2003); *Hanna v. Plumer*, 380 U.S. 460, 468-70 (1965).

Plaintiff contends that he was not guilty of pure forum shopping because Defendant has not offered any evidence that this Court is any more pro-railroad worker or anti-railroad company than the Eastern District of Tennessee, Northern Division.   (Doc. 28.)   Plaintiff also argues that Defendant does not demonstrate that Eastridge chose to file his complaint in order to gain some "advantage" in the prosecution of his claim.  *Id.* Rather, Plaintiff chose to file his complaint with this Court due to a "then-perceived need to immediately commence the lawsuit because such immediate commencement could be done by his selected-counsel in this forum."  *Id.*  However, Defendant responds by contending that plaintiff's counsel is located approximately two blocks from the courthouse where Southern Division cases are tried; therefore, if plaintiff had wanted to file the action quickly in a convenient location, the action would have been filed in the Southern Division of the Northern District of Alabama. (Doc. 30.)

While forum shopping adds weight to the other considerations favoring

transfer, Defendant has not presented evidence establishing that Plaintiff chose this court in order to gain an advantage.  *See A.J. Taft Coal Co.*, 291 F. Supp. 2d at 1309-10 (N.D. Ala. 2003); *compare Ross v. Buckeye Cellulose Corp.*, 980 F.2d 648, 654 (11th Cir. 1993)(court held that district court did not abuse its discretion by transferring case to Middle District of Georgia even though appellants admittedly "sought a forum other than the Middle District because of the historical antipathy towards Civil Rights cases in that district").  Thus, this factor does not affect the transfer of venue analysis.

J.     Additional Costs or Expenses.

Plaintiff argues that he will incur additional costs in litigating in Tennessee arising from the cost of retaining local counsel and the cost of travel.  First, Plaintiff contends that he would incur additional costs or expenses in litigating the claim due to the necessity of retaining Tennessee local counsel.  However, as discussed above, Plaintiff would not have to engage a licensed Tennessee attorney in order to appear *pro hac vice*.[39] *Compare Bodine's Inc.*, 494 F. Supp. at 1286 (where plaintiff would have to retain local counsel, the additional costs were taken into account).

---

[39]*See* Section V(F), *supra*.

In addition, Plaintiff alleges that he would incur costs from his present counsel traveling to and from Tennessee.  However, Plaintiff will incur the traveling costs of his present counsel regardless of where the case is tried due to the fact that his counsel is located in Birmingham, Alabama, and the case will be tried in either Tuscaloosa or Knoxville.  Plaintiff should have expected to incur this cost when he retained counsel outside the forum where the case would be tried.  *See Vizionworks, LLC*, 2007 WL 1100512, at *2-3.

Thus, no specific information on the expenses and costs associated with trial in Tuscaloosa versus Knoxville has been presented.  This factor has no effect upon the venue analysis.

K.    Delay.

According to the Fifth Circuit, "in rare and special circumstances a factor of 'delay' or of 'prejudice' might be relevant in deciding the propriety of transfer, but only if such circumstances are established by clear and convincing evidence."  *In re Horeshoe Entm't*, 337 F.3d at 434.  A court "should not under § 1404(a) look to docket conditions in order simply to serve the court's own convenience.  A prompt trial, however, is not without

relevance to the convenience of the parties and witnesses and in the interest of justice." *Fannin v. Jones*, 229 F.2d 368, 369-70 (6th Cir. 1956); *see also Barnett*, 202 F. Supp. 2d 664; *Ashmore v. Northeast Petroleum Div. of Cargill, Inc.*, 925 F. Supp. 36, 39-40 (D. Me. 1996).

Here, this Court has engaged in pre-trial activities and has set trial for this case. A transfer to the Eastern District of Tennessee will likely result in Plaintiff losing time in having his claims adjudicated since his case would likely be tried in the transferee court after the present trial setting. *See Barnett*, 202 F. Supp. 2d at 670. A transfer of venue at this stage of the trial process would necessarily cause delay in the case. However, Defendant first requested a transfer to the Eastern District of Tennessee early on in the case. Had the case been transferred then, there would have been no delay. This Court kept this matter so that the transferee court would not have to deal with pretrial motions, including the set of motions discussed in this opinion. Therefore, this factor does not significantly weigh in favor of or against a transfer of venue.

In weighing the factors discussed above, the Court finds that Defendant has satisfied its burden of demonstrating that this action should

be transferred to the Eastern District of Tennessee for the convenience of the parties and witnesses, and in the interest of justice.  Accordingly, Defendant's motion to transfer is granted.

VI.    Conclusion.

For the reasons stated above, Defendant's Motion to Preclude Testimony is due to be granted in part and denied in part; Defendant's Motion for Summary Judgment is due to be denied; and Defendant's Motion to Transfer is due to be granted. The Clerk of Court is hereby directed to transfer this case to the United States District Court for the Eastern District of Tennessee, Northern Division. A separate order in conformity with this opinion will be entered.

Done this 15<u>th</u> day of <u>February 2008</u>.

_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
**153671**